## THE STEAMSHIP JEFFERSON.[1]

APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF VIRGINIA.

No. 243. Submitted May 17, 1909.—Decided November 29, 1909.

Where the District Court has allowed an appeal, but has not certified that the question of jurisdiction alone was involved, as required by § 5 of the act of March 3, 1891, c. 517, 26 Stat. 826, if it appears from the face of the record, irrespective of recitals in the order, that the

---

[1] Docket title, Simmons, late Master of the Tug Helen, and Others, *v.* The Steamship Jefferson, The Old Dominion Steamship Company, Claimant and Owner.

cause was dismissed for want of jurisdiction, the question of juris-
diction, if it is of such a character as to sustain the appeal, is suf-
ficiently certified. *United States* v. *Larkin*, 208 U. S. 333.

Where the case is dismissed because the character of the action is one
cognizable exclusively by a court of admiralty and the jurisdiction
is challenged because the situation of the vessel and the character
of the services rendered afforded no jurisdiction in admiralty, the
jurisdiction of the court as a Federal court is involved and the case
is one cognizable by this court under § 5 of the act of 1891.

Salvage service, over which a court of admiralty has jurisdiction, may
arise from all perils which may encompass a vessel when on waters
within the admiralty jurisdiction of the United States, and this in-
cludes services rendered to a vessel undergoing repairs in dry dock
and in danger of being destroyed by fire which originated on land.

A vessel used for navigation and commerce does not cease to be a sub-
ject of admiralty jurisdiction because temporarily in a dry dock
without water actually flowing around her.

158 Fed. Rep. 255, reversed.

THE facts, which involved the jurisdiction of the admiralty
court of a case for salvage services rendered to a vessel in dry
dock and in peril from a fire originating on land, are stated in
the opinion.

*Mr. R. T. Thorp, Mr. Henry Bowden* and *Mr. D. Lawrence
Groner* for appellants:

The jurisdictional question is properly certified. *Shields* v.
*Coleman*, 157 U. S. 176; *Interior Construction Co.* v. *Gibney*,
160 U. S. 217; *Chappell* v. *United States*, 160 U. S. 499; *Mer-
ritt* v. *Bowdoin College*, 167 U. S. 745; *Filhiol* v. *Forney*, 194
U. S. 356; *Petri* v. *Creelman*, 199 U. S. 487; *Excelsior Co.* v.
*Pacific Bridge Co.*, 185 U. S. 282. The jurisdiction of the
Federal court was denied as such. *Dudley* v. *Lake County*,
103 Fed. Rep. 209; *Sun Printing Co.* v. *Edwards*, 121 Fed.
Rep. 826. A vessel is not removed from admiralty jurisdic-
tion because at the time it is in dry dock, for such jurisdiction
depends not on whether the vessel is actually afloat but on the
purposes for which it is used. *The Old Natchez*, 9 Fed. Rep.
476. So also admiralty does not lose jurisdiction over a naviga-

ble river because at times the river becomes unnavigable. *Nelson* v. *Leland*, 22 How. 18. Although a dry dock itself may not be a subject of salvage service, *Cope* v. *Valette Dry Dock Co.*, 119 U. S. 625, as to repairs in dry dock, see *Perry* v. *Haines*, 191 U. S. 17; *Simpson's Dock* v. *Steamship Co.*, 108 Fed. Rep. 425; *The Sapho*, 44 Fed. Rep. 359; *Hoffner* v. *Crane*, 115 Fed. Rep. 404; *United States* v. *Coombs*, 12 Pet. 72. That the fire originated on land is immaterial; vessels afloat saved by being towed from a land fire are subject to salvage. *Kaiser Wilhelm der Grosse*, 106 Fed. Rep. 963; *The J. I. Brady*, 109 Fed. Rep. 912; *The Barge No. 127*, 113 Fed. Rep. 529; *The Old Natchez*, 9 Fed. Rep. 476; *The Lone Star*, 35 Fed. Rep. 793; *Grinby* v. *The Khio*, 46 Fed. Rep. 207; *The Oregon*, 27 Fed. Rep. 871; *Wilson* v. *Winchester*, 30 Fed. Rep. 204. Admiralty jurisdiction extends to a salvage suit for services rendered from land to a vessel burning at a wharf. *The Huntsville*, 12 Fed. Cas. No. 6,916; and see *The Ella*, 48 Fed. Rep. 569, as to salvage for digging out vessel which had been driven ashore.

*Mr. Walter H. Taylor* and *Mr. Harrington Putnam* for appellee:

This court is without jurisdiction. The appeal should have been taken to the Circuit Court of Appeals. If to this court it is not properly certified under § 5 of the act of 1891. *Louisville Trust Co.* v. *Knott*, 191 U. S. 225; *Smith* v. *McKay*, 161 U. S. 358; *Maynard* v. *Hecht*, 151 U. S. 324; *Blythe Co.* v. *Blythe*, 172 U. S. 644; *Schweer* v. *Brown*, 195 U. S. 171.

The decision below was correct and the libel properly dismissed. Quenching a fire on a ship in emptied dry dock is not a basis of salvage. *The Warfield*, 120 Fed. Rep. 847; *The Robt. W. Parsons*, 191 U. S. 17. The Jefferson was not saved from a peril of the sea. 1 Parson's Mar. Ins., 544; *Phillips* v. *Barber*, 5 B. & Ald. 161; *Frame* v. *Ella*, 48 Fed. Rep. 569.

The property salved must be a vessel engaged in commerce or the cargo of a vessel. *The Murphy Tugs*, 28 Fed. Rep. 429; *The*

*Island City*, 1 Lowell, 375; *The Pulaski*, 33 Fed. Rep. 383; *The Hendrick Hudson*, 3 Benedict, 419; *S. C.*, Fed. Cas. No. 6,355.

Salvage is only awarded for saving property from sea perils. *Mason* v. *Ship Blaireau*, 2 Cranch, 240, 266; Benedict's Admiralty, 3d ed., § 300; *The Emulous*, 1 Sumner, 207; 2 Kent's Com., *245; Desty's Shipping and Admiralty, § 303; *M. Benefante*, 5 Revue Int. du Droit Maritime, 568; Schaps Das Deutsche Seerecht, 701; Sieveking, German Law Relating to Carriage of Goods by Sea, Eng. trans., p. 145; *The Merchant Prince*, Hanseatische Gerichszeitung, 1888, Part I, No. 120, p. 276; Burchard on Salvage, Hanover, 1897, p. 29.

English courts before 1821, could not award salvage for services between high and low water mark. 11 Ency. Laws of Eng., 368; Benedict's Adm., § 111; Kennedy, Law of Civil Salvage, 2d ed., p. 2. In England and the United States the question of locality is important as admiralty courts alone can award salvage. *Ex parte Easton*, 95 U. S. 68; *50,000 Feet of Lumber*, 2 Lowell, 64. Fire originating on land is not a sea peril, *The Plymouth*, 3 Wall. 20; and as to adhering to ancient limits of admiralty jurisdiction, see *Cleveland Terminal Co.* v. *Steamship Co.*, 208 U. S. 315; *The Troy*, 208 U. S. 321; *The Poughkeepsie*, 162 Fed. Rep. 494; Adm. Juris. of Torts by Mr. Justice Brown in Columbia Law Review, January, 1909.

In the absence of sea perils claims for salvage rewards are against public policy and the tendency of later cases is not to enlarge but to restrict the subjects of salvage. *Gas Float Whitton*, App. Cas. [1897], 337; *Cope* v. *Vallette Dry Dock*, 119 U. S. 625; Hughes' Handbook of Admiralty, 129. Shipowners' suits against owners of dry docks for injuries on the dock depend for admiralty jurisdiction on maritime nature of contract and on locality. *The Sapho*, 48 Fed. Rep. 359; *Waitman* v. *Griffiths*, 3 Blatchford, 528; but see *The Professor Morse*, 23 Fed. Rep. 803.

MR. JUSTICE WHITE delivered the opinion of the court.

From a decree dismissing this suit for want of jurisdiction

the present direct appeal is prosecuted. Dismissal of the appeal is moved on the ground that the jurisdiction of the court below was not involved in the sense of the fifth section of the act of March 3, 1891, c. 517, 26 Stat. 826, and, in any event, because the question of jurisdiction was not certified as required by that act.

The libel by which the suit was commenced was filed on behalf of the master of the tug Helen, for himself and others entitled to participate, in a salvage allowance if made. The cause of action was thus stated:

"1. That in the afternoon of the twenty-fifth day of December, 1906, the tug Helen whereof said E. W. Simmons was Master, and having a crew of six men besides said master, was, together with the tug Alice, towing a certain barge from Norfolk, in said district, to the piers of the Chesapeake and Ohio Railway Company at Newport News, in said district; that about four or four-thirty o'clock on said day, when said tugs had arrived almost at their destination at Newport News, it was discovered that a fire was raging in the ship yard of the Newport News Ship Yard and Dry Dock Company, and thereupon the libellant, with the said tug Helen, docked his tow at one of the said piers of the Chesapeake and Ohio Railway Company, and proceeded with all possible speed to the said fire:

"2. That when libellant arrived at the said ship yard it was found that a large and fierce fire was raging therein and that said steamship Jefferson, which had been undergoing repairs at the said ship yard, was locked in one of the dry docks out of which the water had been emptied, and was afire, her upper works being then in full blaze and her hull smoking throughout nearly its whole length; that there was no one on board at the time and no one could have stayed aboard under the circumstances; that the water pipes intended for the use of the fire department were frozen up and there was no water available for their use, and that this, together with the fact that the Jefferson was in a peculiar and inaccessible situation being

215 U. S.                    Opinion of the Court.

in a dry dock, rendered the fire engines and fire department totally unable to render any assistance whatsoever; under which circumstances said steamer would have been completely destroyed but for the assistance rendered by libellant and other salvors hereinafter mentioned:

"3. That thereupon libellant with his said tug Helen and crew lay at a bulkhead of one of the piers as close to the said dry dock as possible, and together with the tugs Alice and James Smith, Jr., played streams of water from their fire hose upon said steamship Jefferson, and continued so to do until the fire was completely extinguished; that libellant and other salvors were thus engaged from about four-thirty o'clock in the afternoon of said day until about eight-thirty o'clock at night, during all of which time libellant and said salvors rendered every possible assistance to said steamship, and during all of which time libellant and others entitled as salvors as aforesaid, underwent great suffering from smoke, flame and sparks, and endured great hardship from exposure to the wind and water in the bitter coldness of the weather, and libellant and other salvors incurred great danger from said smoke, flames and sparks, and from electric wires, falling poles, adjacent burning buildings, etc.

"4. That the said steamship Jefferson is of great value; that the aforementioned efforts and services rendered by libellant and other salvors saved the said steamship from total and complete destruction; that libellant, by reason of the hardships necessarily incurred, and especially by reason of the nature and the great importance of the services rendered in saving said steamship, reasonably deserved to have, and therefore claim a commensurate reward for salvage therefor."

By an intervening petition the crew of the tug Helen and the masters and crews of two other tugs, the James Smith, Jr., and the Alice, asserted claims to salvage, on the ground that they had rendered services at the same time and under the same conditions as those which the libel alleged had been rendered by the Helen. The libel and intervening petition

were excepted to by the owner and claimant of the Jefferson upon these grounds:

"First. That the property proceeded against was not at sea or on the coast of the sea or within public navigable waters or on the shores thereof.

"Second. That the property proceeded against was not a vessel engaged in maritime commerce.

"Third. That the libellants. did not render any service at sea or in saving property from any peril of the sea.

"Fourth. That there is not shown any sea peril or such peril as may be the basis of a claim for salvage.

"Fifth. That the Jefferson while in a dry dock, from which au the water had been emptied, when threatened with fire from land was not a subject of salvage services.

"Sixth. That there is not shown any admiralty or maritime lien upon the Jefferson in favor of the libellants for salvage."

The court, on January 14, 1908, handed down an opinion, stating its reasons for concluding that the exceptions were well taken, and hence that it had no jurisdiction over the cause. 158 Fed. Rep. 358. On the twenty-ninth of the same month a final decree was entered dismissing the libel and intervening petitions. In this decree it was recited:

"The court is of opinion, for the reasons stated in the opinion filed on the fourteenth day of January, 1908, that it is without jurisdiction in the premises and that the exceptions should be sustained. . . ."

In the following July the present appeal was prayed on the ground that, as the court had dismissed the case for want of jurisdiction, its action was susceptible of review by direct appeal to this court. In its order allowing the appeal the court stated that "the claim of appeal is allowed as prayed for from the final order and decree dismissing said cause for want of jurisdiction. . . ." As upon the face of the record, irrespective of the recitals in the order made on the allowance of the appeal, it is apparent that the only question

which was decided below was one of jurisdiction, and as the decree, which was appealed from, on its face shows that the cause was dismissed for want of jurisdiction, the question of jurisdiction, if it is of such a character as to sustain the appeal, was sufficiently certified. *United States* v. *Larkin*, 208 U. S. 333, 338. We therefore put the contentions as to the absence of a certificate out of view.

It is settled that, under the act of 1891, in order to entitle to a direct appeal from the decree of a District or Circuit Court dismissing a cause for want of jurisdiction, the decree which is sought to be reviewed must have involved the jurisdiction of the court below as a Federal court. *Louisville Trust Co.* v. *Comingor*, 184 U. S. 18; *Schweer* v. *Brown*, 195 U. S. 171. Relying upon this doctrine, the contention is that the appeal was wrongfully allowed, because, although it may be that in form of expression the court below dismissed the suit for want of jurisdiction, its action was, in substance, alone based upon the conclusion that the facts alleged were insufficient to authorize recovery, even although the cause was within the jurisdiction of the court. The claim which the libel asserted was for salvage compensation, and it therefore presented a character of action cognizable exclusively by a court of admiralty of the United States. *Houseman* v. *The Cargo of the Schooner North Carolina*, 15 Pet. 40, 48. It is clear that the exceptions to the libel and intervening petition challenged the jurisdiction of the court over the cause of action which the libel asserted, because, from the situation of the vessel, the place where the alleged salvage services were rendered, and the nature and character of those services, they afforded no basis for the jurisdiction of the court as a court of admiralty of the United States. That this was also the conception upon which the court below acted in dismissing the libel and intervening petition is apparent from its opinion and the terms of the decree which we have previously referred to. After stating the elements constituting a salvage service, the court observed (158 Fed. Rep., p. 359):

"These, however, have relation to perils encountered and services rendered and performed to vessels actually engaged in commerce, either on the high seas or other public navigable waters. . . . The Jefferson, at the time of the service sued for, was not a medium of commerce subject to dangers and hazards of the sea. She, on the contrary, was in an unseaworthy condition, undergoing repairs. She could not move of her own volition nor could she be moved at the time in furtherance of commerce. She was neither pursuing nor capable of engaging in her ordinary business of navigation of the seas."

Again, in considering the averments of the libel concerning the origin of the fire which, it was alleged, enveloped the Jefferson, and which, it was asserted, had been extinguished by the exertions of the alleged salvors, the court observed, p. 360:

"This language makes it clear that the peril in which the Jefferson was placed arose from a fire on the shore, and that there was no peril in connection with the sea or the navigation thereof."

In summing up its conclusion the court said, p. 361:

"The mere fact that the property upon which the fire was extinguished was that of a vessel will not suffice. There must have been a sea peril from which it was rescued, and the vessel itself must have been at the time the subject of a sea peril, in order to support a maritime lien and afford jurisdiction *in rem* in the admiralty."

As the foregoing considerations demonstrate that the case was dismissed below because of the conclusion that there was no jurisdiction as a Federal court over the subject-matter of the controversy, it results that the motion to dismiss is without merit. Cope v. *Vallette Dry Dock Co.*, 119 U. S. 625; *The Resolute,* 168 U. S. 437; *Cleveland Terminal & Valley R. R. Co.* v. *Cleveland Steamship Co.*, 208 U. S. 316; *Duluth & S. Bridge Co.* v. *The Troy,* 208 U. S. 321; *Scully* v. *Bird,* 209 U. S. 481; *Globe Newspaper Co.* v. *Walker,* 210 U. S. 356.

Passing to the merits, the question is this: Did the facts set forth in the libel *prima facie* state a claim for salvage within the admiralty jurisdiction?

The contention on the part of the appellee that a negative answer should be given to this question is based upon the propositions which controlled the action of the court below. They are: *a*, That at the time the services sued for were rendered the Jefferson was in a dry dock undergoing repairs, was not on the sea, but was virtually on the shore, and was consequently at such time not an instrumentality of navigation, subject to the dangers and hazards of the sea; *b*, The services were not rendered in saving the Jefferson from a maritime peril, as the danger relied on arose outside of the admiralty jurisdiction and not in connection with the sea or the navigation thereof. We shall consider the contentions together.

In the nature of things it is manifest, and indeed it is settled, that because of the broad scope of the admiralty jurisdiction in this country, the perils out of which a salvage service may arise are all of such perils as may encompass a vessel when upon waters which are within the admiralty jurisdiction of the United States, from which it follows, that the right to recover for salvage services is not limited to services concerning a peril occurring on the high seas or within the ebb and flow of the tide. And although in defining salvage the expression "peril of the sea" has sometimes been used as equivalent to peril on the sea, it is settled that the distress or danger from which a vessel has been saved need not, in order to justify a recovery of salvage compensation, have arisen solely by reason of a peril of the sea in the strict legal acceptation of those words. The varied character of services upon which a claim to salvage may be based was pointed out in the definition of salvage given in the opinion in *The Blackwall*, 10 Wall. 1, where it was said (p. 12): "Salvage is the compensation allowed to persons by whose assistance a ship or her cargo has been saved, in whole or in part, from impending

peril on the sea, or in recovering such property from actual loss, as in cases of shipwreck, derelict or recapture."

In *The Blackwall* the facts, in substance, were these: An English ship, with cargo aboard and ready to sail, while lying at anchor in the harbor of San Francisco, about seven or eight hundred yards from the wharves, was discovered to be on fire. A steam tug was utilized in conveying alongside of the ship members of the fire department and two steam fire engines belonging to the city. After the fire had been extinguished the tug took the ship in tow and safely placed her on adjacent flats, in charge of her master and crew. Upholding the right of the owners of the steam tug and her master and crew to salvage compensation, the court said (p. 11):

"Service, undoubtedly, was performed by the members of the fire department; but it is a mistake to suppose that service was not also performed by the steam tug, as it is clear that without the aid of the steam tug and the services of her master and crew the members of the fire company would never have been able to reach the ship with their engines and necessary apparatus, or to have subdued the flames and extinguished the fire. Useful services of any kind rendered to a vessel or her cargo, exposed to any impending danger and imminent peril of loss or damage, may entitle those who render such services to salvage reward.

"Persons assisting to extinguish a fire on board a ship, or assisting to tow a ship from a dock where she is in imminent danger of catching fire, are as much entitled to salvage compensation as persons who render assistance to prevent a ship from being wrecked, or in securing a wreck or protecting the cargo of a stranded vessel." *The Rosalie*, 1 Spink, 188; *Eastern Monarch*, Lush. 81; *The Tees*, Lush. 505; Williams & Bruce Adm. Prac. 92.

The case of *The Rosalie* was one of salvage of a vessel in danger from a fire at sea, and among other things treated as constituting the salving services was the unloading of the cargo upon land. In *The Tees*, salvage was awarded for tow-

ing to a place of safety a vessel lying in a dock and in danger of catching fire from the surrounding warehouses which were in flames. To the English cases cited in the opinion in *The Blackwall* may be added that of *The City of Newcastle*, 7 Asp. Mar. Cas. (N. S.) 546. That case was heard before Justice Bruce, assisted by the Trinity Masters, and the facts in brief were as follows: A fire broke out on board a vessel which was lying alongside a jetty at the entrance to a dock. The vessel was under repairs, with no steam up, and had no one but the master and watchman on board. At the request of the master a steamship, which had just arrived, hove alongside, and getting her hose on board the burning vessel, extinguished the fire, which, if it had remained unchecked, would have caused a very serious damage. The services were such as might have been rendered by a fire engine on shore. The value of the salved vessel was £9,500. The defendants tendered £200. The court upheld the tender, being of opinion that the services were not of such character as to require that the award should be assessed upon the same liberal principles as obtained in the ordinary cases of sea salvage rendered by one ship to another.

And the doctrine of *The Blackwall* and the other cases just reviewed was in substance reiterated in *The Clarita* and *The Clara*, 23 Wall. 1. In that case remuneration was claimed by the libellants as owners of the steam tug Clarita for salvage services rendered by the tug and the officers and crew, in subduing a fire on board the schooner Clara. While at anchor in the middle of the Hudson River the Clara caught fire from contact with a burning ferryboat, which, after being towed from a ferry slip, had gotten adrift. It was not questioned that the services intrinsically considered were salvage services, but because the injury to the schooner was occasioned by the fault of the tug, whose owner, master and crew asserted the salvage claim, the right to salvage was denied. And the principles just announced, when duly appreciated, also establish that the Jefferson while in dry dock undergoing

repairs was subject to the jurisdiction of a court of admiralty and liable for a salvage service. By necessary implication it appears from the averments of the libel that the steamship before being docked had been engaged in navigation, was dedicated to the purposes of transportation and commerce, and had been placed in the dry dock to undergo repairs to fit her to continue in such navigation and commerce. As said in *Cope* v. *Dry Dock Co.*, 119 U. S. 625, 627, "A ship or vessel used for navigation and commerce, though lying at a wharf and temporarily made fast thereto, as well as her furniture and cargo, are maritime subjects, and are capable of receiving salvage service." In reason we think it cannot be held that a ship or vessel employed in navigation and commerce is any the less a maritime subject within the admiralty jurisdiction when, for the purpose of making necessary repairs to fit her for continuance in navigation, she is placed in a dry dock and the water removed from about her, than would be such a vessel if fastened to a wharf in a dry harbor, where, by the natural recession of the water by the ebbing of the tide, she for a time might be upon dry land. Clearly in the case last supposed the vessel would not cease to be a subject within the admiralty jurisdiction merely, because for a short period by the operation of nature's laws, water did not flow about her. Nor is there any difference in principle between a vessel floated into a wet dock, which is so extensively utilized in England for commercial purposes in the loading and unloading of vessels at abutting quays, and the dry dock into which a vessel must be floated for the purpose of being repaired, and from which, after being repaired, she is again floated into an adjacent stream. The status of a vessel is not altered merely because in the one case the water is confined within the dock by means of gates closed when the tide begins to ebb, while in the other the water is removed and the gates are closed to prevent the inflow of the water during the work of repair.

It was long ago recognized by this court that a service rendered in making repairs to a ship or vessel, whether in or

out of the water, was a maritime service. *Peyroux* v. *Howard*, 7 Pet. 324.

But we need not further pursue the subject, since the error of the contention that a vessel, merely because it is in a dry dock, ceases to be within the admiralty jurisdiction, was quite recently established in *The Robert W. Parsons*, 191 U. S. 17. In disposing of the proposition we are now considering it was further said (p. 33):

"A further suggestion, however, is made that the contract in this case was not only made on land, but was to be performed on land, and was in fact performed on land. This argument must necessarily rest upon the assumption that repairs put upon a vessel while in dry dock are made upon land. We are unwilling to admit this proposition. . . . A dry dock differs from an ordinary dock only in the fact that it is smaller, and provided with machinery for pumping out the water in order that the vessel may be repaired. All injuries suffered by the hulls of vessels below the water line, by collision or stranding, must necessarily be repaired in a dry dock, to prevent the inflow of water, but it has never been supposed, and it is believed the proposition is now for the first time made, that such repairs were made on land. . . . But as all serious repairs upon the hulls of vessels are made in dry dock, the proposition that such repairs are made on land would practically deprive the admiralty courts of their largest and most important jurisdiction in connection with repairs. No authorities are cited to this proposition, and it is believed none such exists."

There is in reason no distinction between the continued control of admiralty over a vessel when she is in a dry dock for the purpose of being repaired and the subjection of the vessel when in a dry dock for repairs to the jurisdiction of a court of admiralty for the purpose of passing upon claims for salvage services, by which it is asserted the vessel while in the dock was saved from destruction.

*Reversed and remanded.*