THE NESHAMINY.

(District Court, E. D. Pennsylvania. January 28, 1914.)

Nos. 40, 41.

SALVAGE ☞10—EXTINGUISHING FIRE IN DRY DOCK—VESSEL IN COURSE OF REPAIR.

Prompt and efficient services rendered by two tugs in extinguishing a fire which destroyed the engine house on the side of a floating dry dock and within ten feet of the side of a barge, which was on the dry dock being repaired and was in danger, *held* entitled to a salvage award in admiralty against the barge.

[Ed. Note.—For other cases, see Salvage, Cent. Dig. §§ 18–20; Dec. Dig. ☞10.]

---

In Admiralty. Suits by Charles L. Walker, managing owner of tug Lizzie Crawford, and by John P. Murray, master of the steam tug Delaware, against the schooner barge Neshaminy; Philadelphia & Reading Railway Company, claimant. Decrees for libelants.

J. Frank Staley and Lewis, Adler & Laws, all of Philadelphia, Pa., for The Lizzie Crawford.

Henry R. Edmunds, of Philadelphia, Pa., for the Delaware.

Wm. Clarke Mason, of Philadelphia, Pa., for The Neshaminy.

THOMPSON, District Judge. Both libelants claim for salvage services rendered to the schooner barge Neshaminy. On December 26, 1912, the Neshaminy, a large wooden vessel belonging to the claimant, the Philadelphia & Reading Railway Company, was upon a floating dry dock of the Philadelphia Ship Repair Company at the foot of Mifflin street, Delaware river, Philadelphia, where she had been for about two weeks undergoing repairs. All of the water was out of the dry dock, and the Neshaminy was resting upon blocks which elevated her to the level of the decks of the dry dock. Upon the north side of the dry dock, and about amidships of the barge, there was constructed an engine house about 10 feet in width, which on the south side was flush with the inside of the dry dock and on the north projected over the outside of the dry dock 5 feet 2 inches.

Shortly before 5 o'clock in the morning of the day in question, it was discovered that the engine house was on fire and an employé of the Ship Repair Company asked the master of the tug Delaware, which was lying on the north side of the dock, to sound alarm with her whistle. The alarm was sounded, and the Delaware ran her bow under the engine house, attached her hose, and played a stream of water on the fire. Upon the Neshaminy at that time were her master, engineer, and a deck hand. A few minutes after 5 o'clock, her steward, who had been ashore, came aboard the Neshaminy, aroused the master and informed him of the fire. The master of the Neshaminy, upon discovering the fire, ordered the engineer to get up steam in her boilers. Whether this order was carried out or not does not appear from the testimony. The fire burned fiercely, but by 7 o'clock the crew of the Delaware, with her hose and pumps, had apparently succeeded in getting it under control. By that time all of the engine house had been destroyed, except one corner upon the side towards the Neshaminy. After the Delaware had been playing on the fire for nearly two hours, the city firemen came onto the dock, but could not reach the fire with their hose. Shortly before 7 o'clock, the employés of the Ship Repair Company arrived at the yard, and Davidson, the foreman carpenter, discussed with his assistant the advisability of sinking the dock. The dock is provided with four valves upon each side for the purpose of filling it with water. The suggestion was not carried out, as Davidson considered that the Delaware had the fire under control. Meanwhile, however, the fire had worked its way underneath the engine house into the lining of the sides of the dry dock. Shortly before 7 o'clock the Crawford arrived, came up back of the Delaware and ran her hose over the stern of the Neshaminy. Additional hose was supplied by the Ship Repair Com-

pany, and one of the crew of the Crawford, the city firemen, and the employés of the Ship Repair Company worked the hose from the deck of the Neshaminy while the Crawford worked her pumps. After playing on the fire for about 15 minutes, the blaze at the corner of the engine house was extinguished, and the Crawford continued to pump water for an hour and a half into the side of the dock below its deck until the fire was finally extinguished. As the claimant's witness Davidson stated:

"They had to go down underneath the deck of the dry dock and dig away and get all in the seams, where the fire had eaten in a little into the seams, and get it all out, trying to save the boiler from falling over. Q. The boiler really had a list, hadn't it? A. Yes, sir; the boiler had a list out towards the Delaware. Q. Then, the lieutenant is wrong when he says that it was— A. Yes, sir; he is wrong. If the boiler had fallen any way, it would have fallen over on the Delaware's deck."

The drawing offered in evidence by the respondents corroborated the statement of this witness that, if the boiler had fallen, it would have fallen towards the Delaware and not towards the Neshaminy.

It is apparent from the evidence that the fire, which destroyed the engine house and partially burned the dry dock, endangered the Neshaminy. The claimant denies that the Neshaminy was in danger from the fire, because her master and crew were aboard and stood ready to extinguish any flames which might be communicated to her from embers or sparks dropping upon her deck. The deck of the Neshaminy was covered with slush, which would have prevented any danger from sparks. Her master and crew could have opened the valves and sunk the dry dock, and the same thing could have been done as suggested by the shipyard's employés when they arrived. It was stated by Davidson that, after turning on the valves, it required 12 or 15 minutes to sink the dry dock, and that it could have been sunk by any one not an expert "to let her go down helter-skelter any way"; that is, without regard to keeping the dock level as it was sinking. The master of the Neshaminy testified:

"Q. When you saw the fire in the boiler house on the dry dock, what steps did you take to protect your barge? A. Well, I called the two men out, and I intended to try to sink the barge, but the tug Delaware was lying there, and seeing that he started to play the hose on it, and it seems he held it down pretty well. He held the fire down. Q. Did you give any notice to your engineer concerning steam? A. I told him to go down forward and get steam up on the boiler. Q. How long had you been lying in the dry dock? A. We had been there, I guess, two weeks at that time, pretty near. I guess two weeks, or something like that. Q. How many men did it take to open the valves and sink the dry dock? A. Well, I don't know, but, in case of emergency, I suppose four. You could run from one side to the other. I had the two ladders there. Q. How many valves were there? A. There were four. Q. Four on each side? A. Four on each side, I believe. Q. And, as a result of the way in which the fire was being handled you concluded that there was no necessity to sink the dry dock, and you just waited? A. No; since the Delaware was keeping it down pretty well. Q. At any time during the progress of the fire did the barge seem to be in danger? A. Well, not with the tug Delaware there she didn't seem to be in any danger. Q. From the time that the fire was discovered until it was put out you and your crew stood by your barge? A. Yes, sir; we stood by. We assisted all we could."

It is apparent that, in order to save the Neshaminy from fire, it was necessary either that the fire should be extinguished without sinking the dock, or the dock sunk and the barge pulled, or run by her own power, out of the way of the fire. As the situation existed, she was resting upon a wooden structure upon which the fire had started, and the walls of which were burning on the inside. The Neshaminy had no adequate means of her own to extinguish a fire of this sort. She had no fire equipment, except hand pumps and tanks of water, and their usefulness is a matter of conjecture. It is also a matter of conjecture whether the dock could have been sunk by the crew of the Neshaminy, for it is apparent, from the evidence of the master, that he knew little or nothing about the method of operating the valves, and the shipyard foreman relied upon the tugs to control the fire. The Delaware had played upon the fire for over an hour and a half before it appears that any employé of the Ship Repair Company, understanding the operation of the valves, arrived at the yard. The burden of subduing the fire from the start and saving the Neshaminy from damage, if not destruction, fell upon the Delaware. That she rendered prompt and efficient service is apparent; and it is also apparent that she was in some danger from the possible toppling over of the boiler. As to what would have occurred if the Crawford had not arrived is also conjectural. The Delaware was playing from the north side of the dock; and while she had succeeded in getting the fire, which was consuming the engine house, under control, her hose was not able to reach the flames which were eating their way into the side of the dry dock. This was the situation when the Crawford arrived; and it was by means of the water pumped from the Crawford that the fire was finally extinguished under the deck of the dry dock an hour and a half after her arrival. It does not appear that there was any special risk to the Crawford, but her services were rendered promptly and efficiently. The degree of peril to the Neshaminy was not so great at that time as earlier, as the employés of the repair company, who understood the sinking of the dock, had then arrived. It is apparent, however, that the reason the dock was not sunk was because of the services of the Delaware and Crawford; and it is impossible to determine what would have been the results if the services had not been rendered. In the opinion of the court, both vessels are entitled to salvage.

In The Jefferson, 215 U. S. 130, 30 Sup. Ct. 54, 54 L. Ed. 125, 17 Ann. Cas. 907, after a review of the cases, the Supreme Court held that salvage rendered to a vessel on a floating dry dock while undergoing repairs is the subject of admiralty jurisdiction, even though not floating in the water.

The ruling of Judge Toulmin in The San Cristobal (D. C.) 215 Fed. 615, was not upon a state of facts similar to those in the case at bar. The case was decided upon the ground that no direct service was rendered the steamship, nor the dry dock in which she was lying, nor was either injured by the fire.

In the present case, even if no stream were played by either tug upon the deck of the vessel, the fire but ten feet away scorched the Nesham-

iny's side, and the services rendered were not only designed but effective in relieving her from a danger reasonably to be apprehended, if not actually present.

The services rendered by both vessels were prompt, meritorious, and efficient. The Delaware was subjected to some risk by reason of the overhanging position of the engine house and boiler, and that fact must be taken into consideration in awarding salvage to her.

Neither the Crawford nor her crew were subjected to any apparent risk. It is admitted that the Neshaminy is of the value of $25,000; the Delaware, $4,000; and the Crawford, $8,000. Taking into consideration the early and constant services of the Delaware and her position of risk, it is apparent that she is entitled to a greater proportion of salvage than the Crawford. The principle should be borne in mind that one of the objects of a salvage award is to reward services which are perilous and to induce seamen and others to readily engage in such undertakings and assist in saving property. The peril to the Delaware was not great, as it is probable that she could have backed away and prevented the engine house and boiler falling upon her deck; and, as the services of the Crawford did not involve risk to her or any one of her crew, the services are not of such a character as to require that the award should be assessed upon the same liberal principles as obtain in the ordinary cases of sea salvage rendered by one ship to another in case of distress, where the salving vessel and her crew are subject to serious peril.

Under the circumstances, an award will be made to the Delaware of $600 and to the Crawford of $200, with costs to each libelant. It was understood at the hearing that the division of any salvage award to the Delaware would be agreed upon between the owners, the charterers, and the crew. It is assumed that the same arrangement has been made in regard to the Crawford, as no suggestion has been made in the briefs as to division of salvage.

Decrees may be entered accordingly.