PACIFIC MAIL S. S. CO. v. SCHMIDT.†

(Circuit Court of Appeals, Ninth Circuit. May 18, 1914.)

No. 2352.

1. ADMIRALTY (§ 13*)—JURISDICTION—SUIT FOR SEAMAN'S WAGES—VESSEL IN PORT.

The claim of a steward of a steamship, regularly signed under shipping articles, for his wages while the vessel is in port discharging at the end of a voyage and preparing for another, is maritime and within the admiralty jurisdiction, where, although he was discharged before sailing, his term of service had not expired, and up to the time of discharge he was engaged in cleaning the ship, storing supplies, and otherwise in discharging the duties of his position.

[Ed. Note.—For other cases, see Admiralty, Cent. Dig. §§ 164–176; Dec. Dig. § 13.*]

2. SEAMEN (§ 2*)—WHO ARE SEAMEN—STEWARD.

Under the general maritime law, as well as under Rev. St. § 4612 (U. S. Comp. St. 1901, p. 3120), which provides that every person (apprentices excepted) who shall be employed or engaged to serve in any capacity on board a vessel shall be deemed a seaman, the steward of a steamship is a seaman.

[Ed. Note.—For other cases, see Seamen, Cent. Dig. §§ 1–3; Dec. Dig. § 2.*

For other definitions, see Words and Phrases, vol. 7, pp. 6374–6375.]

3. SEAMEN (§ 33*)—WAGES ON DISCHARGE—PENALTY FOR NONPAYMENT.

Under Rev. St. § 4529, as amended by Act Dec. 21, 1898, c. 28, § 4, 30 Stat. 756 (U. S. Comp. St. 1901, p. 3077), which provides that the master or owner of any vessel who shall without sufficient cause refuse to make payment of wages to a seaman at the times therein specified "shall pay to the seaman a sum equal to one day's pay for each and every day during which payment is delayed, which sum shall be recoverable as wages in any claim made before the court," the entry of a decree for wages in favor of a seaman does not merge his entire cause of action, including that for the penalty, which by the express terms of the statute continues until payment is made, and where the respondent without sufficient cause appeals from the decree and stays its execution the appellate court may remand the cause, with directions to add the appropriate penalty.

[Ed. Note.—For other cases, see Seamen, Cent. Dig. §§ 218, 219; Dec. Dig. § 33.*]

Dietrich, District Judge, dissenting.

Appeal from the District Court of the United States for Division No. 1 of the Northern District of California; M. T. Dooling, Judge.

Suit in admiralty by Ed. Schmidt against the Pacific Mail Steamship Company. Decree for libelant, and respondent appeals. Affirmed.

For opinion below, see 209 Fed. 264.

Knight & Heggerty, of San Francisco, Cal., for appellant.

James W. Ryan, of San Francisco, Cal., for appellee.

Before GILBERT and ROSS, Circuit Judges, and DIETRICH, District Judge.

ROSS, Circuit Judge. The appellee shipped as steward, at the wages of $100 a month, on board the steamship City of Sydney, the

home port of which was New York, under shipping articles of date July 24, 1913, signed on behalf of the respective parties, then "bound from the port of San Francisco to Ancon, Canal Zone, and such other ports and places in any part of the world as the master may direct, and back to the final port of discharge in San Francisco, the United States, for a term of time not exceeding six calendar months." Among the terms specified in the articles were the following:

"And it is hereby agreed that any embezzlement or willful or negligent destruction of any part of the vessel's cargo or stores shall be made good to the owner out of the wages of the person guilty of the same. * * * And it is also agreed that the master has the option to transfer any and all of the within mentioned persons, members of the crew, to any other American, British, or other foreign vessel bound to San Francisco, California, in the same capacity or as a passenger and at the same rate of wages for final discharge any time during the period of time called for by these shipping articles."

The case shows that the ship left San Francisco on the 24th of July, 1913, for Balboa, returning to San Francisco on the 23d day of the following September, and that on the next day, September 24th, the appellee received from the shipping commissioner all of his wages for that round trip—the ship then being tied up at the wharf discharging her cargo. What the appellee did during that time, and what is referred to by the trial judge and by counsel as the custom then prevailing at the port of San Francisco, is thus stated by the appellee in his testimony, of which we find no contradiction in the other evidence:

"Q. What was the procedure after you returned from the voyage regarding receiving your money? A. I got paid off by the shipping commissioner, my wages due to me for that voyage.

"Q. Why did you remain on board the ship? A. I was still chief steward on the boat, and not notified I had been discharged for anything, and I worked on board as chief steward.

"Q. What are the duties of the chief steward on the steamer? A. During the voyage?

"Q. Yes; during the voyage. A. He is simply the head of the commissary department; keeps the rooms clean, and looks after the passengers, and so on.

"Q. What else? A. To look after his help, and see that the work is done.

"Q. What does the chief steward do?

"The court: Q. You have charge of the rooms of the passengers, have you? A. Yes, sir.

"Mr. Ryan: Q. What does the chief steward do after he arrives in port? A. After he arrives here we clean the ship.

"Q. You mean you superintend it? A. Yes; and see that the stores are put on board for the next voyage—get the ship ready for sea for the next voyage.

"Q. Is your work while in port very similar to that while on the voyage? A. Yes.

"Q. What is the difference between your duties while on the voyage and while the ship is in port? A. The difference is we have no passengers on board. While we are in port we do not cook any meals. We just clean up, and see that repairs are done and the stores put on board for the next voyage.

"Q. When are the supplies ordered, and who orders them? A. I put in a requisition for supplies and deliver the requisition book to the port steward.

"Q. Who places those provisions on board? A. The chief steward. He sees that it is put on board.

"Q. How many men are employed under you while the vessel is on the voyage? A. The steward's department, or what they call the commissary department, in that company, has 22.

"Q. That includes the title of what positions? A. The steward. the steerage cooks and bakers, butchers, cooks, waiters.

"Q. How long after the ship arrives at the dock do the seamen go before the shipping commissioner and receive their wages? A. Generally it is the day after.

"Q. And how long before the vessel leaves the dock do the seamen go before the shipping commissioner and sign new articles? A. One day before leaving on that voyage."

The evidence is that the appellee was allowed $1 a day for his meals while in port, as no cooking was done on board during the time, and that such was the custom at the port of San Francisco. The day before the ship was to sail on its next voyage the appellee was discharged, at which time there was due him for his wages and meals while in port $30.33, the amount of which was not questioned; but when he demanded it on the 1st day of October, 1913, the appellant steamship company refused to pay it, on the contention that certain silverware, which the company claimed was intrusted to him as chief steward when he shipped in July, was not accounted for by him at the end of the trip or thereafter, amounting in value to $32.90, which sum the company claimed the right to offset against his wages of $30.33 earned while in port; and this set-off it pleaded as a defense to the appellee's libel for his wages, which libel also contained a demand against the steamship company for one day's pay for every day his wages were unpaid after October 1, 1913, as a penalty under and by virtue of section 4529 of the Revised Statutes as amended by Act Dec. 21, 1898, c. 28, § 4, 30 Stat. 756 (U. S. Comp. St. 1901, p. 3077), for which penalty, together with the wages due, the court below awarded the libelant a decree. The section of the Revised Statutes, as so amended, is as follows:

"The master or owner of any vessel making coasting voyages shall pay to every seaman his wages within two days after the termination of the agreement under which he shipped, or at the time such seaman is discharged, whichever first happens; and in the case of vessels making foreign voyages, or from a port on the Atlantic to a port on the Pacific, or vice versa, within twenty-four hours after the cargo has been discharged, or within four days after the seaman has been discharged, whichever first happens; and in all cases the seaman shall, at the time of his discharge, be entitled to be paid, on account of wages, a sum equal to one-third part of the balance due him. Every master or owner who refuses or neglects to make payment in manner hereinbefore mentioned without sufficient cause shall pay to the seaman a sum equal to one day's pay for each and every day during which payment is delayed beyond the respective periods, which sum shall be recoverable as wages in any claim made before the court; but this section shall not apply to the masters or owners of any vessel the seamen on which are entitled to share in the profits of the cruise or voyage."

[1] It is contended on the part of the appellant company that the case is not within the admiralty and maritime jurisdiction of the court, for the reason that the service of the appellee while the ship was at the port of San Francisco was not a maritime service. There is nothing in the decision of the case of California-Atlantic S. S. Co. v. Central Door & Lumber Co., 206 Fed. 5, to justify the contention, nor is there in the case of The Sirius (D. C.) 65 Fed. 226. In the latter case the keeper of a vessel in her home port and then out of commission

filed a libel against her for his services, and the court said, among other things:

"The libelant, we have seen, rendered the service of a ship keeper in the home port of the vessel. He was hired particularly to take care of the engine and boilers, and also to look after the vessel in general. In this he was assisted by a deck watchman. How his duties, assuming them to have been efficiently rendered, contributed to the navigation of the Sirius, it is difficult to see. The vessel was not then engaged in navigation. She could not do so, being out of commission. She was laid up, without cargo, or even master and crew. Giving the libelant's claim the most favorable consideration, it can only be said that his services tended to the preservation of the vessel, so that when she should be enrolled as an American vessel she might be fitted out for a voyage less expensively and more expeditiously. But such service did not contribute to the navigation of the vessel. Merely keeping a vessel in safe custody, protecting it from the depredations of thieves or the danger of fire, or preserving her machinery from unnecessary decay and deterioration, does not, of itself, constitute a maritime service. It must be connected with the navigation of the vessel. It is difficult to see, therefore, upon what ground it can be said that the libelant rendered a service of a maritime nature. His services did not contribute to the present navigation of the vessel, because she was then laid up; nor to her prospective navigation, because she had no voyage in contemplation. To be sure, it concerned the vessel; but it did not concern the vessel with reference to her navigation, present or prospective. Looking at the question in the light of the authorities, we find that, although there has been, and is yet, some conflict as to whether a mere ship keeper or watchman can be deemed to have rendered a maritime service, the weight of authority is against the right of individuals performing such services to a vessel in her home port to recover in a court of admiralty, for the reason that it is not regarded as a maritime service, within the signification of that term. But the cases, while establishing this general rule, have also created exceptions which, if given full latitude, may become almost as wide as the rule itself. The reason for the exceptions is that, if the ship keeper or watchman, in connection with his duty as such, render any distinctively maritime service, such as moving the vessel to a different anchorage, or preparing or fitting her out for a voyage, or in brief any service connected with the navigation or voyage of the vessel, then the court of admiralty will not only take cognizance of the maritime service rendered, but, if it be sufficiently broad and pronounced, will treat the entire service as maritime."

In the present case the vessel was in active service, the present libelant a regular seaman under shipping articles, whose term of service had not expired, and who, while the ship was discharging her cargo preparatory to another voyage, was cleaning ship, storing supplies therein, and otherwise performing the duties pertaining to his position of steward.

In the case of Leathers v. Blessing, 105 U. S. 626, at page 628 (26 L. Ed. 1192), which was an action of tort, the Supreme Court held that the jurisdiction in admiralty is not ousted by the fact that when the wrong was done on the vessel by the negligence of her master she had completed her voyage and was securely moored at the wharf, where her cargo was about to be discharged, the court saying, among other things:

"The only question raised by the appellants is as to whether the suit was one of admiralty jurisdiction in the District Court. They maintain that jurisdiction of the case belonged exclusively to a court of common law. Attention is directed to the facts that the Circuit Court did not find that the libelant was an officer, seaman, passenger, or freighter, or that he had any connection with the vessel or any business upon her or about her, except

that when he went on board of her he was expecting a consignment of cotton seed by her, and went on board to ascertain whether it had arrived, and that the vessel had fully completed her voyage and was securely moored at the wharf at the time the accident occurred. It is urged that the case is one of an injury received by a person not connected with the vessel or her navigation, through the carelessness or neglect of another person, and that the fact that the person guilty of negligence was at the time in control of a vessel which had been previously engaged in navigating waters within the jurisdiction of the admiralty courts of the United States cannot give jurisdiction to such courts. .Although a suit might have been brought in a common-law court for the cause sued on here, the District Court, sitting in admiralty, had jurisdiction of this suit. The vessel was water-borne in the Mississippi river at the time, laden with an undischarged cargo, having just arrived with it from a voyage. The findings sufficiently show that her cargo was to be discharged at the place where she was moored. Therefore although the transit of the vessel was completed, she was still a vessel occupied in the business of navigation at the time. The facts that she was securely moored to the wharf and had communication with the shore by a gangplank, did not make her a part of the land or deprive her of the character of a water-borne vessel."

In the case of The Steamship Jefferson, 215 U. S. 130, 30 Sup. Ct. 54, 54 L. Ed. 125, 17 Ann. Cas. 907, which was a case of salvage, and where the jurisdiction of the court was challenged on the ground that at the time the services sued for were rendered the ship "was in a dry dock undergoing repairs, was not on the sea, but was virtually on the shore, and was consequently at such time not an instrumentality of navigation, subject to the dangers and hazards of the sea," the Supreme Court said, among other things:

"By necessary implication it appears from the averments of the libel that the steamship, before being docked, had been engaged in navigation, was dedicated to the purposes of transportation and commerce, and had been placed in the dry dock to undergo repairs to fit her to continue in such navigation and commerce. As said in Cope v. Dry Dock Co., 119 U. S. 625, 627 [7 Sup. Ct. 336, 337 (30 L. Ed. 501)]: 'A ship or vessel used for navigation and commerce, though lying at a wharf and temporarily made fast thereto, as well as her furniture and cargo, are maritime subjects, and are capable of receiving salvage service.' In reason, we think it cannot be held that a ship or vessel employed in navigation and commerce is any the less a maritime subject within the admiralty jurisdiction when, for the purpose of making necessary repairs to fit her for continuance in navigation, she is placed in a dry dock and the water removed from about her, than would be such a vessel if fastened to a wharf in a dry harbor, where, by the natural recession of the water by the ebbing of the tide, she for a time might be upon dry land. Clearly, in the case last supposed, the vessel would not cease to be a subject within the admiralty jurisdiction merely because, for a short period, by the operation of nature's laws, water did not flow about her. Nor is there any difference in principle between a vessel floated into a wet dock, which is so extensively utilized in England for commercial purposes in the loading and unloading of vessels at abutting quays, and the dry dock, into which a vessel must be floated for the purpose of being repaired, and from which, after being repaired, she is again floated into an adjacent stream. The status of a vessel is not altered merely because, in the one case, the water is confined within the dock by means of gates closed when the tide begins to ebb, while, in the other, the water is removed and the gates are closed to prevent the inflow of the water during the work of repair. It was long ago recognized by this court that a service rendered in making repairs to a ship or vessel, whether in or out of the water, was a maritime service. Peyroux v. Howard, 7 Pet. 324 [8 L. Ed. 700]. But we need not further pursue the subject, since the error of the contention that a vessel, merely because it is in a

dry dock, ceases to be within the admiralty jurisdiction, was quite recently established in The Robert W. Parsons, 191 U. S. 17 [24 Sup. Ct. 8, 48 L. Ed. 73]. In disposing of the proposition we are now considering, it was further said (191 U. S. 33, 24 Sup. Ct. 13, 48 L. Ed. 73): 'A further suggestion, however, is made that the contract in this case was not only made on land, but, was to be performed on land, and was, in fact, performed on land. This argument must necessarily rest upon the assumption that repairs put upon a vessel while in dry dock are made upon land. We are unwilling to admit this proposition. * * * A dry dock differs from an ordinary dock only in the fact that it is smaller, and provided with machinery for pumping out the water in order that the vessel may be repaired. All injuries suffered by the hulls of vessels below the water line, by collision or stranding, must necessarily be repaired in a dry dock, to prevent the inflow of water; but it has never been supposed, and it is believed the proposition is now for the first time made, that such repairs were made on land. * * * But, as all serious repairs upon the hulls of vessels are made in dry docks, the proposition that such repairs are made on land would practically deprive the admiralty courts of their largest and most important jurisdiction in connection with repairs. No authorities are cited to this proposition, and it is believed none such exists.'"

[2] It seems to be now settled that the services of stevedores in loading or unloading a vessel are maritime in character, which is, of course, based upon the theory that the voyage of the vessel does not end in the one case until the cargo has been discharged, and in the other that the voyage commences at the time the vessel begins to receive cargo. 1 Cyc. p. 833, and note to the case of Baltimore Steam Packet Co. v. Patterson, 66 L. R. A. 193, and numerous cases there cited. That the appellee was a seaman of the City of Sydney in rendering the services in question, and as such within the admiralty jurisdiction, we regard as clear. Section 4612 of the Revised Statutes expressly provides, among other things, that:

"In the construction of this title, every person having the command of any vessel belonging to any citizen of the United States shall be deemed to be the 'master' thereof; and every person (apprentices excepted) who shall be employed or engaged to serve in any capacity on board the same shall be deemed and taken to be a 'seaman.'"

But, regardless of the statute, we think that under the general maritime law the present libelant was a seaman, and as such entitled to sue in admiralty. In Benedict's Admiralty (4th Ed.) § 189, it is said:

"The term 'mariner' includes all persons employed on board ships and vessels during the voyage to assist in their navigation and preservation, or to promote the purposes of the voyage. Masters, mates, sailors, surveyors, carpenters, coopers, stewards, cooks, cabin boys, kitchen boys, engineers, pilots, firemen, deck hands, waiters—women as well as men—are mariners."

In the case of The Queen v. Judge of the City of London Court and the Owners of the S. S. Michigan, 25 Law Reports, Q. B. D. 339, the ship having arrived at the port of London, which was her destination, her crew, including the mate, were paid off. The mate, after being so paid, and without signing any fresh articles for the outward voyage, remained on board by the direction of the owner for the purpose of superintending the discharge of the inward cargo and the loading of a fresh cargo for the outward voyage. After the inward cargo had been discharged and a portion of the outward cargo had been shipped on

board, the ship was taken into dock for repairs, and the mate continued on board by the owner's direction to superintend the execution of such repairs. The question was whether the services so rendered by the mate were maritime services, and the judges thus disposed of the question:

"Lord Coleridge, C. J. We have had an opportunity of consulting the learned judge of the Admiralty Court, who has had a large experience in these matters, and although my own impression was at first the other way, I defer to his authority, and come to the conclusion that the County Court judge was wrong, and that an action in rem will lie at the suit of a person in the position of the present plaintiff. To allow of that remedy in such cases as this has, it appears, been the practice of the Admiralty Court. I find that we are not embarrassed with the consequences which I was afraid would follow if our decision proceeded upon the definition of the term 'seaman' in the Merchant Shipping Act—a definition which would undoubtedly include such a person as a stevedore. For the question here does not depend in any way upon the Merchant Shipping Act, inasmuch as the act of Parliament giving admiralty jurisdiction to County Courts does not incorporate that act. The action ought to be heard. The rule must, therefore, be made absolute.

"Wills, J. I am of the same opinion. I have had the opportunity, not only of speaking to my Brother Butt upon the subject, but also of looking into the question for myself, and, upon consideration of the authorities, I have independently arrived at the same conclusion. The case seems to me to be practically governed by the case of The Jane and Matilda, where Lord Stowell held that the woman who had acted as caretaker was entitled to claim against the ship—a decision which, so far as I can make out, seems to be entirely in accordance with the uniform current of authority. The right to proceed in rem for services rendered on board a ship apparently extends to every class of person who is connected with the ship as a ship, as a seagoing instrument of navigation, or of transport of cargo from one place to another and to services rendered by such persons in harbor just as much as to services rendered by them at sea. It is, of course, matter of common knowledge that one of the most essential parts of the chief mate's duty is to look after the cargo, and see that proper care is taken of it. I am of opinion that the services rendered by the plaintiff were maritime services, although the vessel was actually in harbor at the time."

In the subsequent case of Corbett v. Pearce, [1904] 2 K. B. D. 427, the court said:

"What is usually understood by the term 'seaman' in its ordinary acceptation? It seems to me that a correct definition was given in the case, to which we have been referred, of Reg. v. City of London Court, where it was held that a person whose ordinary duties led him to take part in the navigation of a seagoing ship was entitled to a remedy against the ship for his wages, although the services rendered by him consisted in superintending repairs to the ship while in port. It was there said: 'The right to proceed in rem for services rendered on board a ship apparently extends to every class of person who is connected with the ship as a ship, as a seagoing instrument. of navigation, or of transport of cargo from one place to another, and to services rendered by such persons in harbor just as much as to services rendered by them at sea.' That description of the persons who may popularly be called seamen is very applicable to the present case."

The trial court in the instant case was, in our opinion, right in holding that the set-off pleaded in defense of the libel was not sustained by the evidence. There was nothing tending to show any bad faith on the part of the steward, or even tending to show any negligence or lack of care on his part in the performance of his duties; nor was

there, as said by the trial judge, sufficient evidence of the alleged miss-
ing articles ever having been delivered into his keeping.  On the con-
trary, the appellant's San Francisco port steward testified that it was
usual on voyages for a small amount of the silverware of the ship to
be taken by the passengers "for souvenirs, and for medicine, and for
one thing and another"—usually $5 or $6 worth, said the witness.  In
the present case the amount claimed to have been lost was, as has been
said, of the value of $32.90.

We are of the opinion that no sufficient cause was shown for the
refusal of the appellant to pay the libelant his wages upon his discharge
from service.

The only remaining question is whether the provision of section 4529
of the Revised Statutes, as amended December 21, 1898, imposing the
designated penalty for failure to pay the wages within the required
time, is applicable to the case.

It is first contended on behalf of the appellant that the section refer-
red to expressly relates to "seamen shipped under an agreement."
That is true; but the answer is, as has been above pointed out, that the
libelant was a seaman and rendered the service for which he libeled the
ship under shipping articles duly executed and in force at the time of
the rendition of the service.

The further contention is made that it has been uniformly held that
the penalty will not be imposed in any case where there is a fair ground
of dispute.  Conceding the justice of the rule, we are of opinion that
the evidence in the present case does not show any such fair ground of
dispute.

It has been suggested that the libelant's entire cause of action was
merged in the judgment entered in the trial court, that the delay in
paying that judgment is compensated for by interest thereon, and also
that the prescribed penalty is too severe to impose upon a litigant while
acting in good faith.  Apart from the fact that the court has no right
to hold the penalty which Congress saw fit to prescribe is too severe,
the latter suggestion is, we think, answered by the above statement to
the effect that in this case the appellant had no fair ground upon which
to base its refusal to pay the seaman his wages.

Nor do we think the ordinary rule respecting the merger of a cause
of action in a judgment applicable to such a case as the present; for,
while the statute declares that the prescribed penalty "shall be recover-
able as wages in any claim made before the court," it does not limit
it to the time of the entry of the judgment of the trial court, but, on
the contrary, expressly declares that the master or owner who refuses
or neglects to make payment of the seaman's wages in the manner
therein specifically prescribed "without sufficient cause shall pay to the
seaman a sum equal to one day's pay for each and every day during
which payment is delayed beyond the respective periods."

Certainly, by appealing from the judgment of the court of first in-
stance and procuring a stay of that judgment, the appellant as effec-
tively delayed the payment of the wages adjudged to be due the sea-
man as it did by refusing without sufficient cause to pay him upon his
discharge, and we can see no valid ground for holding that a court of

admiralty, in disposing of a cause so brought before it, may not give effect to the express requirement of the statute by directing the court below to enter the appropriate judgment upon the return of the cause to it. Congress did not see fit to allow the legal interest on the judgment first entered by the trial court to compensate the seaman for the delay in the payment of his wages in the prescribed circumstances, but expressly declared that he should be allowed "a sum equal to one day's pay for each and every day during which payment is" so delayed.

It results that the judgment of the court below was correct when rendered, but, as under the provisions of section 4529 of the Revised Statutes the appellee is entitled to one day's pay for every day since October 1, 1913, in addition to the amount due him for services, the cause is remanded to the court below, with directions to enter a decree in accordance with the views above expressed, with costs to the appellee in both courts.

DIETRICH, District Judge (dissenting). I am unable to concur in that part of the opinion in which it is held that the lower court should now enlarge the original decree by including therein the statutory penalty for the time which has elapsed since the decree was entered. I fail to see any substantial reason for concluding that the plaintiff's cause of action was not merged in and swallowed up by the decree, as is the general rule. United States v. Price, 50 U. S. (9 How.) 83, 93, 13 L. Ed. 56.

As to the severity of the penalty, there is, of course, no thought of suggesting that a court can properly decline to enforce a statute because it may seem to be unnecessarily harsh. But the question being, what is the meaning of the statute, what penalty Congress really intended to impose, it is deemed proper to consider the effect of the law in practical operation, for if, under one of two possible constructions it will operate with extreme and unnecessary severity, and under the other it will operate reasonably and yet accomplish the purpose for which it was enacted, other considerations being equal, I conceive it to be the duty of the court to adopt the latter meaning. What will be the result of establishing the rule now laid down by the court? The case is itself fairly illustrative: It is not often that an appeal can be heard and decided so quickly, and yet upon an obligation of $30, penalties amounting to approximately $800 have already accrued during the pendency of the appeal. The right of appeal is thus virtually denied, for no sensible litigant of ordinary resources would attempt to assert it in the face of such hazards. The appeal here is prosecuted in good faith. True, we have found that there was no fair ground originally for declining to pay the appellee's claim; but that does not necessarily imply bad faith or a willingness to oppress. It is a case of bad judgment rather than of bad faith. Besides, the rightfulness of its refusal to pay the claim is not the only question which appellant brings to this court. It also presents here, as is its right, the question of the correctness of the lower court's holding that the case falls within the provisions of section 4529 of the Revised Statutes, imposing the penalty complained of; and this I conceive to be a fair question, the answer to which is not free from serious doubt.

It is to be borne in mind that the law is rendered harsh, not by interpreting it in the light of a general principle, that is, the principle of merger, with which it may be assumed Congress was familiar, but by holding that it is exempt from the operation thereof, and is an exception to the rule. No reason is assigned for such a course, except that which may be found in a rigidly literal reading of the provision. But why should we insist that the strict letter prevail over the presumption that Congress intended that in the administration of the law regard should be had for the general principles under which other laws of like character are administered. A decision directly in point is that of Massachusetts v. Western Union Telegraph Co., 141 U. S. 40, 46, 11 Sup. Ct. 889, 35 L. Ed. 628. A statute of Massachusetts imposed a penalty for the nonpayment of taxes "at the rate of twelve per cent. per annum until the same [the taxes] are paid." There, as here, by the strict terms of the law there was to be a continuous accumulation of the penalty until the principal obligation was discharged. But the court said: ·

"The penal rate of 12 per cent. interest ran only until the amount to be recovered was judicially ascertained. Since the date of the decree below, interest is to be computed on the lawful amount of the decree at the rate of 6 per cent. only."

Upon principle I cannot see how that case can be distinguished from this, and it should, I think, be held to be conclusive.

Appreciating the strain, the appellee suggests that, this being an admiralty case, the trial here is de novo, and that final decree is in this court; but this is an erroneous assumption. Benedict's Admiralty (4th Ed.) § 566. As appears from the opinion, there has been no new trial, nor will any decree be entered here.