764 F.2d 224
 1985 A.M.C. 2317, 53 USLW 2618,
Prod.Liab.Rep.(CCH)P 10,602
 James T. OMAN; Fred R. Walker; Willie A. Gibbons, and Hugh
V. Reynolds, Appellees,
v.
JOHNS-MANVILLE CORP.; Johns-Manville Sales Corporation,
Successor by merger with Johns-Manville Products
Corporation; Raybestos-Manhattan, Inc.; The Celotex
Corporation; Unarco Industries, Inc.; H.K. Porter Company;
Southern Textile Corporation; Eagle-Picher Industries,
Inc.; Owens-Corning Fiberglas Corp., Defendants,
and
Pittsburgh Corning Corporation, Appellant.
James T. OMAN; Fred R. Walker; Willie A. Gibbons and Hugh
V. Reynolds, Appellees,
v.
JOHNS-MANVILLE CORP.; Johns-Manville Sales Corporation,
Successor by merger with Johns-Manville Products
Corporation; The Celotex Corporation; Unarco Industries,
Inc.; Southern Textile Corporation and Eagle-Picher
Industries, Inc., Defendants,
and
Raybestos Manhattan, Inc. (now Raymark Industries, Inc.);
H.K. Porter Company and Pittsburgh Corning
Corporation, Appellants.
 Nos. 82-1821, 82-2042.
 United States Court of Appeals,
Fourth Circuit.
 Argued Oct. 2, 1984.
Decided June 6, 1985.
 
 Archibald Wallace, III, Richmond, Va. (Nathan H. Smith, Sands, Anderson, Marks & Miller, Richmond, Va., John B. King, Jr., Robert L. O'Donnell, Vandeventer, Black, Meredith & Martin, Norfolk, Va., William V. Hoyle, Charles A. Smith, W. Vinton Hoyle, Jr., Hoyle, Corbett, Hubbard & Smith, Newport News, Va., on brief), for appellants.
 Joel I. Klein, Washington, D.C. (Paul M. Smith, Onek, Klein & Farr, Washington, D.C., Robert R. Hatten, Patten, Wornom & Watkins, Newport News, Va., Richard S. Glasser, Glasser & Glasser, Norfolk, Va., on brief), for appellees.
 Before WINTER, Chief Judge, and WIDENER, HALL, PHILLIPS, MURNAGHAN, SPROUSE, ERVIN and CHAPMAN, Circuit Judges.
 CHAPMAN, Circuit Judge:
 
 
 1
 In this consolidated appeal we consider whether the federal courts may assert admiralty jurisdiction over manufacturers of products containing asbestos for injuries to land-based ship repair workers which injuries were allegedly caused by exposure to air-borne asbestos fibers. The parties argued this appeal before a three-judge panel on November 1, 1983. On June 6, 1984, this Court, sua sponte, called for an en banc hearing of this appeal to reconsider White v. Johns-Manville Corporation, 662 F.2d 234 (4th Cir.1981) (White II ). Today we overrule White II, adopt a four-part nexus test and hold, under the nexus test, that the federal courts may not exercise admiralty jurisdiction over damage claims by land-based ship repair or construction workers for employment-related, asbestos induced disease. In doing so we reverse the district court and remand the case for further proceedings consistent with this opinion.
 
 
 2
 * This appeal grows out of four of the thousands of cases brought throughout this country against the manufacturers of asbestos containing products by workers who have contracted asbestosis and its related diseases. Plaintiffs, James T. Oman, Fred R. Walker, Hugh V. Reynolds, and Willie A. Gibbons, were land-based shipyard workers for Newport News Shipbuilding and Drydock Company. They claim to have contracted asbestosis after being exposed to asbestos fibers in the course of their employment.
 
 
 3
 In 1976 each plaintiff brought an action in federal court against the defendants, Johns-Manville Corp., Johns-Manville Sales Corporation, successor by merger with Johns-Manville Products Corporation; Raybestos-Manhattan, Inc.; The Celotex Corporation; Unarco Industries, Inc.; H.K. Porter Company; Southern Textile Corporation; Eagle-Picher Industries, Inc.; Owens-Corning Fiberglas Corp. Generally, injured workers bring these types of actions in state court or in the federal courts under diversity jurisdiction. In either forum state substantive law governs. These plaintiffs, however, alleged that the district court could exercise its admiralty jurisdiction in their cases because of their employment in a shipyard. They claim to be in admiralty but they admittedly do not perform tasks traditionally done by sailors.
 
 
 4
 After consolidating these cases, the district court, in March 1978, issued an order declining to assert admiralty jurisdiction because the alleged injuries bore no reasonable relationship to traditional maritime activity. Throughout the entire history of these cases the defendants have objected to the exercise of admiralty jurisdiction.
 
 
 5
 After the trial of their cases plaintiffs appealed from the March 1978 order, as well as two others.[1] A three-judge panel of this court vacated the order of the district court. White, 662 F.2d at 238-40.
 
 
 6
 Since White II was decided five other courts of appeal[2] have considered this issue and for different reasons have rejected White II either in whole or in part. By different analyses, each circuit has concluded that admiralty jurisdiction does not extend to damage claims by land-based ship repair or construction workers for employment-related, asbestos-induced disease.
 
 
 7
 We now join these circuits. Before we conduct the analysis by which we reach this decision, we must discuss admiralty jurisdiction in general and our reasons for overruling White II.
 
 II
 
 8
 Historically, federal courts used a situs or locality test to determine if a tort action was within admiralty jurisdiction. If the tort occurred upon the high seas or navigable waters the federal court could exercise its admiralty jurisdiction pursuant to Article II, Section 2 of the United States Constitution and 28 U.S.C. Sec. 1333(1). See The Plymouth, 70 U.S. (3 Wall) 20, 35-36, 18 L.Ed. 125 (1866). The federal courts tend to exercise admiralty jurisdiction restrictively because its use invokes substantive maritime law which "may tend to preempt state regulation of matters traditionally within the ambit of local control." Harville v. Johns-Manville Products Corp., 731 F.2d 775, 780 (11th Cir.1984). In discussing this principle the Supreme Court has stated:
 
 
 9
 The power reserved to the states, under the Constitution, to provide for the determination of controversies in their courts may be restricted only by the action of Congress in conformity to the judiciary sections of the Constitution ... Due regard for the rightful independence of state governments, which should actuate federal courts, requires that they scrupulously confine their own jurisdiction to the precise limits which [a federal] statute has defined.
 
 
 10
 Executive Jet Aviation, Inc. v. Cleveland, 409 U.S. 249, 272-73, 93 S.Ct. 493, 506-07, 34 L.Ed.2d 454 (1972) (quoting Victory Carriers, Inc. v. Law, 404 U.S. 202, 212, 92 S.Ct. 418, 425, 30 L.Ed.2d 383 (1971) ).
 
 
 11
 In Executive Jet the Supreme Court rejected the use of the mechanical and simplistic locality test as the exclusive test for admiralty jurisdiction. In reaching this decision the Supreme Court discussed some of the problems with the locality test, especially the absurdity of invoking admiralty jurisdiction for torts which satisfy the locality test, but have absolutely no connection with maritime activity, Executive Jet, 409 U.S. at 255-56, 93 S.Ct. at 498, and discussed the creation of numerous exceptions to the rule. Id. at 259-60, 93 S.Ct. at 500. In light of this, the Supreme Court held that the location of the tort in maritime waters was insufficient by itself to invoke admiralty jurisdiction. To the traditional maritime location requirement the Court added an additional requirement that the wrong bear a "significant relationship to traditional maritime activity." Id. at 268, 93 S.Ct. at 504. In applying this additional nexus requirement the Court found it necessary to consider the history and purpose of admiralty law:
 
 
 12
 The law of admiralty has evolved over many centuries, designed and molded to handle problems of vessels relegated to ply the waterways of the world, beyond whose shores they cannot go. That law deals with navigational rules--rules that govern the manner and direction those vessels may rightly move upon the waters. When a collision occurs or a ship founders at sea, the law of admiralty looks to those rules to determine fault, liability, and all other questions that may arise from such a catastrophe. Through long experience, the law of the sea knows how to determine whether a particular ship is seaworthy, and it knows the nature of maintenance and cure. It is concerned with maritime liens, the general average, captures and prizes, limitation of liability, cargo damage, and claims for salvage.
 
 
 13
 Id. at 269-70, 93 S.Ct. at 505. This rationale underlying admiralty jurisdiction gives us guidance in deciding when the "law of the sea" should govern a particular case.
 
 
 14
 Executive Jet involved the crash of an airplane into Lake Erie and the Supreme Court did not clearly indicate that the additional nexus requirement applied to all tort cases in which a party sought to invoke admiralty jurisdiction. In Foremost Insurance Co. v. Richardson, 457 U.S. 668, 102 S.Ct. 2654, 73 L.Ed.2d 300 (1982), the Supreme Court made it clear that this two part test for admiralty jurisdiction applied to all tort cases in which a party sought to invoke the federal court's admiralty jurisdiction. Id. at 674, 102 S.Ct. at 2658; see Myhran v. Johns-Manville Corp., 741 F.2d 1119, 1121 (9th Cir.1984); Harville, 731 F.2d at 781.
 
 III
 
 15
 We must review White II in light of the Supreme Court's reasoning in Executive Jet and Foremost Insurance. In White II this court first held that the location test had been met. We agree with White II that the plaintiffs' injuries satisfy the locality test.
 
 
 16
 In the present case, the plaintiff employees alleged in their complaint that they had installed asbestos insulation materials during ship construction and repair in the course of their employment with Newport News. Their work was performed at both the shipyard and drydock areas as well as aboard the vessels while they were located on navigable waters. Thus, the allegations would meet the locality test of Executive Jet.
 
 
 17
 White II, 662 F.2d at 239; Harville, 731 F.2d at 783.
 
 
 18
 The court then held that the work done in the shipyards by the plaintiffs bore a significant relationship to traditional maritime activity because the installation of the asbestos products has a direct effect on marine navigation and commerce. White II, 662 F.2d at 239.
 
 
 19
 [E]ach of these employees spent a significant part of his working career in the fabrication and replacement of various types of asbestos insulation materials for use on public and private ships. Without such shipyard efforts, these vessels would have been unable to perform their maritime role as carriers of people and cargo. Thus, installation of insulation materials, which by their very nature become an appurtenance, or integral part, of the ship, is clearly essential to the maritime industry. Therefore, the work done by these shipyards bears a "significant relationship to traditional maritime activity" because the installation of the asbestos products has a direct effect on marine navigation and commerce.
 
 
 20
 That second holding was then limited to the particular circumstances of the cases, "when the materials used by these shipyard workers were designed, advertised and marketed as maritime asbestos products ..." Id. at 240.
 
 
 21
 We are overruling White II for two reasons: (1) the analysis used to reach the holding that the nexus test had been met is flawed and (2) the cases relied on by the Court in White II are distinguishable. In discussing the nexus test and Executive Jet, the Court stated, "The opinion of the [Supreme] Court [in Executive Jet ] gives no indication as to what actual activities would satisfy the maritime 'nexus' test." Id. at 239. The court overlooked the Supreme Court's discussion of the history and purpose of admiralty law, see Executive Jet, 409 U.S. at 269-70, 93 S.Ct. at 505 (quoted supra p. 227), which does give us guidance concerning the activities which satisfy the nexus test.
 
 
 22
 The Court, without the benefit of this guidance, then proceeded to analyze the facts in White II to determine if the nexus test had been met. In its analysis the Court focused almost exclusively on the function of the plaintiffs to reach its holding. "Hence, we must examine the function of these shipyard workers in fathoming their relationship to maritime commerce and navigation." Id. at 239. Although White II correctly discussed the importance to the maritime industry of the work done by these plaintiffs at the shipyards, nevertheless the Court reached the wrong conclusion because the Court failed to examine all the factors necessary for a complete analysis of the nexus relationship. By focusing exclusively on the plaintiffs and the work they performed, this Court overemphasized that factor and, in effect, created a mechanical test inconsistent with the Supreme Court's reasoning in Executive Jet and Foremost Insurance.
 
 
 23
 Also, in focusing on the plaintiff's activities the Court failed to consider that the activities of these plaintiffs were not the types of activities traditionally done by sailors.
 
 
 24
 Furthermore, the cases relied upon for support in White II are distinguishable. White II relied on Pan-Alaska, Fisheries, Inc. v. Marine Construction, 565 F.2d 1129 (9th Cir.1977); JIG the Third Corp. v. Puritan Marine Insurance Underwriters Corp., 519 F.2d 171 (5th Cir.1975); Jones v. Bender Welding & Machine Works, Inc., 581 F.2d 1331 (9th Cir.1978); and Sperry Rand Corp. v. Radio Corporation of America, 618 F.2d 319 (5th Cir.1980). In Pan-Alaska a ship caught fire and sank because of a defective fuel filter. In JIG the Third Corp. a ship sank because of a malfunctioning steel shaft. In Jones the ship's engine repeatedly failed because of manufacturer defects in the engine. In Sperry Rand the vessel grounded and was involved in a collision because of a defect in its gyro-pilot steering system. Unlike the present cases those four cases involve situations in which the defective products caused injuries to the ship which specifically implicated the maritime concerns discussed by the Supreme Court in Executive Jet. See supra p. 227.
 
 
 25
 The present cases involve injuries which do not implicate those maritime concerns and are not unique to seamen.
 
 
 26
 The plaintiffs here were engaged in trades, such as pipefitting, welding, and insulating, linked more with the land than with the sea. Their skills and training are those of landsmen, not of sailors. The plaintiffs' "role and function", although related to maritime commerce do not call for the application of admiralty jurisdiction ... Nothing about the underlying claims would be different if the plaintiffs had been employed constructing or repairing buildings on land....
 
 
 27
 We can foresee no way in which a result in this case in favor of either the land-based shipyard workers or the asbestos manufacturing defendants will have any more than the most attenuated impact on maritime commerce. None of the issues that the Supreme Court listed in Executive Jet are involved. Rather, the issues that this litigation presents are identical to those presented in countless other asbestos suits; they involve questions of tort law traditionally committed to local resolution.
 
 
 28
 Harville, 731 F.2d at 785 and 786.
 
 
 29
 In this case the injury producing material was not the insulation but the asbestos fibers contained within the insulation. These naturally occurring fibers do not raise the same concerns as a gyro-pilot steering system; nor do the injuries produced by these fibers raise the same maritime concerns as the injuries caused by the malfunctioning steel shaft, the defects in the engine, or the defects in the fuel filter.
 
 
 30
 This would be a completely different case if these manufacturers were being sued because the asbestos was defective and, as a result, a fire spread throughout a ship causing it to sink. In such case the injury would be peculiar to admiralty and would invoke maritime concerns such as those mentioned by the Supreme Court in Executive Jet. See Austin v. Unarco Industries, Inc., 705 F.2d 1, 10-11 (1st Cir.1983).
 
 
 31
 Furthermore, the requirement in White II that the materials which caused the injuries be designed, advertised, and marketed as maritime products creates a mechanical analysis inconsistent with Executive Jet and Foremost Insurance. Under this requirement the nexus test would be met with some products whose use in maritime commerce is important but which do not raise the traditional maritime concerns discussed in Executive Jet. Other products which were not designed, advertised, and marketed as maritime products, but do invoke those maritime concerns, would not satisfy the nexus test. See Austin, 705 F.2d 9-11.
 
 IV
 
 32
 Instead of the White II analysis, we adopt a nexus test by which we must consider four factors[3] in analyzing the relationship a given claim bears to traditional maritime activity: (1) the functions and roles of the parties; (2) the types of vehicles and instrumentalities involved; (3) the causation and the type of injury; and (4) traditional concepts of the role of admiralty law. Myhran, 741 F.2d at 1121; Harville, 731 F.2d at 783; Owens-Illinois v. United States District Court, 698 F.2d 967, (9th Cir.1983).
 
 
 33
 Although the plaintiffs have met the locality test, we hold that their claims are not cognizable in admiralty because their claims do not bear a significant relationship to traditional maritime activity under our application of the four part nexus test. First we must consider the functions and roles of both the plaintiffs and the defendants. The function and role of the defendants slightly favor the exercise of admiralty jurisdiction. The materials used by the shipyard workers were "designed, advertised and marketed as maritime asbestos products...." White II, 662 F.2d at 240; but see Harville, 731 F.2d at 784 ("The defendants [as in this case Johns-Manville] ... are land-based manufacturers whose asbestos products, although important components in the construction and maintenance of vessels, were not designed specifically for maritime use."); Austin, 705 F.2d at 10 ("... whatever advantage accrues from a uniform national law governing those cases would be severely undercut by distinguishing between manufacturers according to whether they designed or intended their products for maritime use"). Of the four factors this part of the first factor is the only one which favors the exercise of admiralty jurisdiction.
 
 
 34
 Next we consider the function and role of the plaintiffs. All four were pipe coverers or insulators. As we have discussed, supra p. 228, we agree with White II that the work done by these plaintiffs was important to maritime commerce. White II, however, overemphasized the role and function of the plaintiffs and, in so doing, elevated their function into something it is not--a maritime activity.
 
 
 35
 Importance to maritime commerce by itself is not sufficient to bring an activity within the scope of admiralty jurisdiction. Harville, 731 F.2d at 784. To be in admiralty the plaintiffs must have been doing what sailors normally do or used to do.
 
 
 36
 More germaine is whether the activity is of a "maritime" nature. Courts have tended to describe contracts for ship repair as "maritime".... Nevertheless, in a tort case to label a pipefitter's occupation "maritime" on Monday because he is working on repairs to a completed vessel and to call identical work done on Tuesday "non-maritime" because he labors aboard an unfinished hull, is to retreat into the same sort of mechanical analysis dependent on fortuity that the Supreme Court condemned in Executive Jet.... [T]he question properly asked is whether the actual tasks the workers perform bear any inherent relationship to maritime activity, that is, whether the plaintiffs' jobs are identical to those undertaken by land-based workers and are connected to maritime affairs merely because performed aboard ship, or whether they are tasks somehow unique to maritime service or work traditionally done by seaman.
 
 
 37
 Id. at 784-85 (citations omitted). As pipe coverers and insulators these plaintiffs had the skills and training of landsmen, and not of sailors. Sailors occasionally may be called upon to take out a patch of insulation and replace it in an emergency, but that type of activity is normally done by landsmen. Although their roles and functions were related to maritime commerce, this factor does not call for the application of admiralty jurisdiction. Id. at 785; Myhran, 741 F.2d at 1122; see Lowe v. Ingalls Shipbuilding, a Division of Litton Systems, Inc., 723 F.2d 1173, 1188 (5th Cir.1984).
 
 
 38
 In Lowe the Fifth Circuit questioned White II's rationale that because the products "become an appurtenance, or integral part, of the ship," therefore their installation "has a direct effect on marine navigation and commerce." White II, 662 F.2d at 239. The Fifth Circuit considered this rationale to be
 
 
 39
 contrary to the rule that ship construction contracts are not maritime and to the statement in Grant Smith-Porter Ship Co. v. Rohde, 257 U.S. 469, 42 S.Ct. 157-66 L.Ed. 321 (1922), that neither a ship construction worker's "general employment" nor his work on an incomplete ship lying in navigable waters "had any direct relation to navigation or commerce." Id. at 476, 421 S.Ct. at 158. White II gives no express consideration to these principles.
 
 
 40
 Second we consider the causation and type of injury. "The non-maritime nature of the plaintiffs' injuries, injuries that now afflict thousands of land-based workers as well, militate strongly against application of maritime jurisdiction." Harville, 731 F.2d at 785; see Myhran, 741 F.2d at 1122-23 ("[A]sbestos does not bear any inherent relationship to maritime activity, nor is it unique to maritime service."); Owens-Illinois, Inc. v. United States District Court, 698 F.2d 967, 971 (9th Cir.1983) ("[B]oth the injury and its cause are far more closely affiliated with the clearly land-based negligence arising in the construction industry generally than with negligence taking place in commerce and navigation on the navigable waters.") We agree that the causation and type of injuries to the plaintiffs do not support the invocation of admiralty jurisdiction.
 
 
 41
 Third we examine the types of vehicles and instrumentalities involved. Although these plaintiffs were exposed to asbestos aboard ships, the involvement of the ships is at most tangential to the nature of their tort claims and has no effect on the character of those claims. These claims would be exactly the same if the plaintiffs had been employed constructing or repairing buildings on land. Myhran, 741 F.2d at 1122; Harville, 731 F.2d at 785.
 
 
 42
 While ships were obviously involved here, the tools and safety equipment (or lack thereof) present in the installation and clean-up of asbestos--unlike the navigational equipment and safety devices of a vessel--possess few maritime attributes. The use of masks, unlike the provision of lifeboats, is hardly a precautionary measure distinctively connected to traditionally maritime activity.
 
 
 43
 Owens-Illinois, 698 F.2d at 971. The simple fact that these plaintiffs were injured aboard ship does not support or justify admiralty jurisdiction.
 
 
 44
 Insulation containing asbestos is the other instrumentality involved. Although the particular insulation products may have been designed, manufactured, and advertised as maritime or marine insulation, such insulation has no uniquely maritime character and exposure to asbestos does not bear any inherent relationship to maritime activity. Myhran, 741 F.2d at 1122; Harville, 731 F.2d at 785.
 
 
 45
 Finally we consider the traditional concepts of the role of admiralty law, the most important factor. We have previously discussed the history and purpose of admiralty law as described by the Supreme Court in Executive Jet and Foremost Insurance. Disputes which do not involve these interests should not fall within the admiralty jurisdiction of the federal courts. None of the issues listed by the Supreme Court in Executive Jet and Foremost Insurance are involved in this action.
 
 
 46
 Rather, the issues that this litigation presents are identical to those presented in countless other asbestos suits; they involve questions of tort law traditionally committed to local resolution. Absent congressional action, the federal interest in these claims is insufficient to justify federal courts supplanting state law with the federal common law of admiralty.
 
 
 47
 Harville, 731 F.2d at 786. Furthermore, the resolution of these tort claims does not "require the special expertise of the court in admiralty as to navigation or water-based commerce, nor is there any federal interest in uniformity of decision requiring the application of federal substantive law." Myhran, 741 F.2d at 1122.
 
 
 48
 The federal interest in uniformity of the law governing maritime matters favors our decision in this case. Each circuit that has considered the issues raised in White II and in this case has rejected the exercise of admiralty jurisdiction. Thus, White II is a deviation from a uniform view held by the other circuits. With this decision uniformity is restored.
 
 V
 
 49
 Plaintiffs argue that this decision should be applied prospectively only. We disagree and apply it retroactively and prospectively. With this decision we are not changing the law concerning admiralty jurisdiction but are correcting an erroneous application of the nexus requirements. White II failed to recognize what type of activities satisfy the maritime nexus test and the defendants from the very beginning of this litigation have consistently objected to admiralty jurisdiction. They should not be denied the fruits of their labor in finally convincing a majority of this court of the merit of their position.
 
 
 50
 Plaintiffs are understandably concerned about the problems they face with the Virginia statute of limitations. The potential injustice to these plaintiffs from the application of a short statute of limitations does not mandate this court to assert its admiralty jurisdiction. "By granting the federal courts jurisdiction over maritime disputes, the Constitution does not license them to repair injustice wherever they may perceive it. The purpose of admiralty jurisdiction is not to permit the federal courts to recognize causes of action for claims they believe meritorious whenever state law precludes such claims." Harville, 731 F.2d at 786. Virginia's statute of limitation is a matter of state concern, governed by state law, which we may not interfere with in this case.
 
 VI
 
 51
 The defendants have raised three other issues for our consideration: (1) whether the district court abused its discretion concerning certain procedural matters at trial; (2) whether the district court erred in failing to grant certain motions by Raybestos and Pittsburg Corning for summary judgment or judgment NOV; and (3) whether the district court erred in charging the jury concerning the defendants' duty to warn these plaintiffs when the plaintiffs' employer had an equal or greater knowledge of the dangers associated with the allegedly defective product.
 
 
 52
 The defendants contend that the district court abused its discretion by denying their motions for a change of venue or a change of venire and by scheduling multiple plaintiffs' trials instead of individual trials. These are matters within the sound discretion of the district court. We have considered the arguments presented by the defendants and find that the district court did not abuse its discretion concerning these matters.
 
 
 53
 The second claim is that the district court failed to grant the motions of Raybestos and Pittsburg Corning for summary judgment or judgment NOV. Because we are remanding this case to the district court for further proceedings and because our decision in this appeal may have a profound effect upon the parties we refuse to reach this issue. The district court should reconsider this on remand.
 
 
 54
 The third and final issue presented for review concerns the sufficiency of the district court's charge to the jury regarding the defendants' duty to warn. The defendants argue that the district court should have charged the jury that the manufacturer's duty to warn the ultimate users, the employees, is satisfied if a sophisticated employer is aware of the dangers involved in the use of the product.
 
 
 55
 In Featherall v. Firestone Tire and Rubber Co., 219 Va. 949, 252 S.E.2d 358 (1979), the Supreme Court of Virginia adopted Restatement (Second) of Torts Sec. 388 (1965) to govern a manufacturer's duty to warn about dangers associated with a product's use.[4] Featherall, 219 Va. at 962, 252 S.E.2d at 366. Virginia law includes comment n of Sec. 388, "Warnings given to third person." Jones v. Meat Packers Equipment Co., 723 F.2d 370, 373 (4th Cir.1983); Barnes v. Litton Indus. Products, Inc., 555 F.2d 1184, 1188 (4th Cir.1977); Goodbar v. Whitehead Bros., 591 F.Supp. 552, 557 (W.D.Va.1984).
 
 
 56
 Comment n discusses the various factors a court must balance to determine what precautions the manufacturer or supplier of a product must take to satisfy the requirement of reasonable care found in Sec. 388(c). These factors include: (1) the dangerous condition of the product; (2) the purpose for which the product is used; (3) the form of any warnings given; (4) the reliability of the third party as a conduit of necessary information about the product; (5) the magnitude of the risk involved; and (6) the burdens imposed upon the supplier by requiring that he directly warn all users. These considerations must be balanced to determine if the manufacturer owes a duty to place a warning on his product.
 
 
 57
 In this case the product, because it contained asbestos fibers, was very dangerous. The burden on the manufacturers in placing a warning on the product was not great. The employer was unaware of the danger until 1964. Finally, once the employer became aware of the potential danger it failed to convey its knowledge to its employees. We cannot say that the district court erred in refusing to give the charge requested by the manufacturers under the set of facts involved in this case.[5]
 
 
 58
 The decision in the district court is reversed and this case is remanded for further proceedings consistent with this opinion.
 
 
 59
 REVERSED AND REMANDED.
 
 K.K. HALL, Circuit Judge, dissenting:
 
 60
 Because I believe that the reasoning in White v. Johns-Manville Corporation, 662 F.2d 234 (4th Cir.1981) (White II ) continues to be sound, I dissent from the majority's jurisdictional analysis in this case and adhere to my conclusion in White II which found the exercise of admiralty jurisdiction proper. I am also of the view that the majority's opinion overruling White II should be applied prospectively only.
 
 
 61
 I am authorized to state that Judge PHILLIPS joins in this opinion.
 
 WIDENER, Circuit Judge, dissenting:
 
 62
 I respectfully dissent and adhere to the view I expressed in White II, 662 F.2d 234 at p. 241.
 
 
 
 [1]
 See White II for a complete procedural history of this case
 
 
 [2]
 Myhran v. Johns-Manville Corp., 741 F.2d 1119 (9th Cir.1984); Harville v. Johns-Manville Products Corp., 731 F.2d 775 (11th Cir.1984); Lowe v. Ingalls Shipbuilding, 723 F.2d 1173 (5th Cir.1984); Austin v. Unarco Industries, Inc., 705 F.2d 1 (1st Cir.1983); Keene Corp. v. United States, 700 F.2d 836 (2d Cir.1983); Owens-Illinois v. United States District Court, 698 F.2d 967 (9th Cir.1983)
 
 
 [3]
 The other circuits which have considered this issue have considered either some or all of these four factors. We believe that a thorough analysis of the nexus requirement should include a consideration of at least these four factors
 
 
 [4]
 Section 388 states:
 One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier
 (a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and
 (b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and
 (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.
 
 
 [5]
 Comment n to Sec. 388 supports this conclusion:
 Thus, while it may be proper to permit a supplier to assume that one through whom he supplies a chattel which is only slightly dangerous will communicate the information given him to those who are to use it unless he knows that the other is careless, it may be improper to permit him to trust the conveyance of the necessary information of the actual character of a highly dangerous article to a third person of whose character he knows nothing. It may well be that he should take the risk that this information may not be communicated, unless he exercises reasonable care to ascertain the character of the third person, or unless from previous experience with him or from the excellence of his reputation the supplier has positive reason to believe that he is careful. In addition to this, if the danger involved in the ignorant use of a particular chattel is very great, it may be that the supplier does not exercise reasonable care in entrusting the communication of the necessary information even to a person whom he has good reason to believe to be careful. Many such articles can be made to carry their own message to the understanding of those who are likely to use them by the form in which they are put out, by the container in which they are supplied, or by a label or other device, indicating with a substantial sufficiency their dangerous character. Where the danger involved in the ignorant use of their true quality is great and such means of disclosure are practicable and not unduly burdensome, it may well be that the supplier should be required to adopt them.