Charles R. **HASSINGER**, Administrator of the Estate of Stanley H. Hassinger, III; Janet Mead Proctor, Administratrix of the Estate of Robert Diego Proctor and James B. Powell, Administrator of the Estate of Stuart L. Powell, Appellees,

v.

**TIDELAND ELECTRIC MEMBERSHIP CORPORATION, Defendant,**

and

**Coleman Company, Inc. and Coast Catamaran Corporation, Appellants.**

Charles R. **HASSINGER**, Administrator of the Estate of Stanley H. Hassinger, III; Janet Meade Proctor, Administratrix of the Estate of Robert Diego Proctor and James B. Powell, Administrator of the Estate of Stuart L. Powell, Appellees,

v.

**TIDELAND ELECTRIC MEMBERSHIP CORPORATION, Appellant,**

and

**Coleman Company, Inc. and Coast Catamaran Corporation, Defendants.**

Nos. 85–1672, 85–1673.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 10, 1985.

Decided Jan. 8, 1986.

See also, D.C., 622 F.Supp. 146.

Robert M. Hughes, III, (Glen A. Huff, Seawell, Dalton, Hughes & Timms, Norfolk, Va., on brief), Arthur W. O'Connor, Jr. (George R. Ragsdale, Moore, Ragsdale, Liggett, Ray & Foley, P.A., Armistead J. Maupin, John Turner Williamson, Maupin, Taylor & Ellis, P.A., Raleigh, N.C., on brief), for appellant.

Vance Barron, Jr. (McNeill Smith, Smith, Moore, Smith, Schell & Hunter, Greensboro, N.C., Daniel L. Brawley, Marshall, Williams, Gorham & Brawley, Wilmington, N.C., W. Timothy Haithcock, Barnes, Braswell & Haithcock, P.A., Goldsboro, N.C., on brief), for appellees.

Before PHILLIPS and ERVIN, Circuit Judges, and McMILLAN, United States District Judge for the Western District of North Carolina, sitting by designation.

McMILLAN, District Judge:

Defendants Tideland Electric Membership Corporation (Tideland), Coleman Company, Inc. (Coleman) and Coast Catamaran Corporation (Catamaran) appeal the denial by the district court of their motions to dismiss this action for lack of admiralty jurisdiction. They argue that the district court erred when it held (1) that admiralty jurisdiction does not stop at the water's edge but goes to the mean high water mark; (2) that the "extension of land" doctrine, which can operate to deny admiralty jurisdiction, does not apply here; and (3) that there was a significant relationship or "nexus" between the alleged wrongs of each appellant and traditional maritime activity.

We AFFIRM.

## I. Background

The testimony and other evidence will support the following findings:

On June 5, 1982, Stanley H. Hassinger, III, Robert Diego Proctor, Stuart L. Powell, and Rex King sailed two eighteen-foot Hobie Cat sailboats across Pamlico Sound to Silver Lake in Okracoke, North Carolina. At about 1:00 p.m., they decided to beach their boats. It is unclear whether all four participated in beaching the Hassinger boat or whether Powell stayed with the other boat and only came over when he saw his friends in trouble (compare King Deposition, A–65, to Fulcher Deposition, A–332). In the process of beaching the Hassinger boat, the mast hit an energized, uninsulated power line carrying 7,200 volts of electricity. King was thrown clear and survived. Hassinger, Powell, and Proctor were electrocuted.

Administrators for the three decedents brought these actions against Tideland, the owner and operator of the power line, and against Catamaran and Coleman, the alleged designers, manufacturers and sellers of the Hassinger sailboat. Jurisdiction over Tideland, Catamaran, and Coleman was based in part on admiralty pursuant to 28 U.S.C. § 1333 and 46 U.S.C. § 740. Plaintiffs also alleged that the court had federal question jurisdiction pursuant to 28 U.S.C. § 1331 over Tideland and diversity jurisdiction pursuant to 28 U.S.C. § 1332 over Coleman and Catamaran. The court later dismissed the federal question claims against Tideland (A–481 to 483).

Tideland filed a motion to dismiss pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction (A–101). Coleman and Catamaran filed a motion to dismiss the application of admiralty law to them. All parties filed affidavits and depositions with the district court on the issue of the location of the boat, the decedents, and the power line relative to the water at the time of the accident.

The district court found that it did have jurisdiction in admiralty (A–471 to 488). Nevertheless, it certified for interlocutory appeal "the admiralty jurisdiction issue" (A–492).

## II. Admiralty Jurisdiction

Article III, Section 2 of the United States Constitution provides that the judicial power of the United States shall extend to "all cases of admiralty and maritime jurisdiction." In 28 U.S.C. § 1333 Congress gave the district courts original jurisdiction over "[a]ny civil case of admiralty or maritime jurisdiction...." And in 46 U.S.C. § 740, Congress extended the admiralty and maritime jurisdiction of the United States to include "all cases of damage or injury, to person or property, caused by a vessel on navigable water, notwithstanding that such damage or injury be done or consummated on land."

The Supreme Court has held, however, that for admiralty jurisdiction to exist in the federal courts the alleged wrong must (1) occur "on or over navigable waters" and (2) "bear a significant relationship to traditional maritime activity." *Executive Jet Aviation, Inc. v. City of Cleveland*, 409 U.S. 249, 268, 93 S.Ct. 493, 504, 34 L.Ed.2d 454 (1972). These two requirements are known respectively as the "situs" and the "nexus" requirements. The appellants challenge the district court's findings as to both. We will consider the "situs" issue first.

### A. Situs

The situs requirement is satisfied if the boat or ship is partly in or over the water. *See, e.g., Blanchard v. American Commercial Barge Line Co.*, 343 F.Supp. 920 (M.D.La.1972), *aff'd* 468 F.2d 950 (1972); *Mayer Boat Works, Inc. v. Bright Marine Basin, Inc.*, 265 F.Supp. 352 (E.D.N.Y. 1966).

There was some evidence that the boat was not in the water. Deputy Carl Teeter stated that he took a photograph (EA–3) of the boat about thirty minutes after the accident and that the boat had not been moved since the accident (A–436, 437). The photograph shows the boat out of the water. Rex King, the lone survivor of the

accident, stated that the boat was on land when it hit the power line (A–95) and that the photograph (EA–3) accurately represented its position (A–76). Murray Fulcher, the proprietor of a nearby store, thought, but was not absolutely sure, that the boat was not in the water when it hit the power line (A–384, 385). And Ronald O'Neal, an employee of appellant Tideland, without stating when he arrived at the scene, said that the boat "was entirely on dry land ..." (A–170).

The apparently greater weight of evidence, however, supports the conclusion that a substantial part of the Hassinger boat was in or over the water. According to James Strickland, the "sailboat was half in and half out of the water" (A–153). Irving Garish stated that "as far as I can recall about half of the boat was in the water" (A–158). James Henning stated that "about half the sailboat was in the water and about half of it was on the beach, as far as I can remember" (A–223). Bill Burk said that "the boat was half in and half out of the water" (A–119), and Judy Lineberger stated that "over half of the sailboat was in the water" (A–144).

Phil Hoft arrived at the scene in another boat seven to eight minutes after the accident. Hoft stated in an affidavit that "about three feet of the stern of the Hassinger sailboat was still in the water" (A–114). In his deposition, he said that the "stern quarter portion of the boat was in the water" (A–282). Terry Deakle, who was sailing in the boat with Hoft, stated in an affidavit that "approximately one-half of the stern of the Hassinger sailboat was in the water" (A–127). Both Hoft and Deakle stated that the photograph taken by Deputy Carl Teeter (FA–3) was *not* an accurate representation of the accident because it showed the boat fully out of the water (A–282, A–301).

Robert Shafer and Richard Payne were sailing behind Hoft and Deakle and arrived soon after them (A–135, A–149). Shafer stated that Hassinger's boat was "about half in the water and about half on the beach" (A–136). Payne stated that "the

stern of the Hassinger sailboat was about two or two and one-half feet into the water, and the rudders were elevated to the rear of the stern out over the water" (A–150).

Russell Newell said that "the stern of the boat was in the water. ... About half the boat was in the water" (A–133). Milford Loebsack stated that "the stern extended two or three feet from the beach into the water" (A–147). Tom Beach said, "the rudder of the boat was still in the water" (A–156, A–316). Clifford Helig said, "I distinctly recall that the rudders and about a one-foot length of the stern were in the water" (A–220).

Philip Sawyer said, "about one-third of the boat, the stern and rudders, was in the water" (A–227). John Perry said that the "rear one-third of the sailboat ... was in the water" (A–458). According to Robert Barnhardt, "the stern portion of the boat was in the water" (A–461).

The district court did not make a finding as to whether the boat was in the water or out of the water at the time of the electrocutions. He simply found that the boat was below the mean high water mark, and held as a matter of law that "navigable water" extends to the mean high water mark. The appellants do not challenge the court's finding that the boat was below the mean high water mark. They strenuously argue, however, that the district court's legal conclusion was incorrect; that "navigable water" and therefore admiralty jurisdiction extends only to the water's *edge* at any given time. They base this argument on an ancient English case known as *Sir Henry Constable's Case* which is summarized by Mr. Justice Storey in *DeLovio v. Boit*, 7 F.Cas. 418 (D.C.D.Mass.1815) (No. 3776):

> "On the other hand, in Sir Henry Constable's Case, 5 Coke, 106, etc., it was expressly adjudged, as has been already stated, that the soil, on which the sea ebbs and flows, may be parcel of a manor, and that, when the sea flows and has plenitudinem maris, the admiral shall have jurisdiction of every thing done on the water, between the high and low

water mark, by the ordinary and natural course of the sea; and yet, when the sea ebbs, the land may belong to a subject, and every thing done on the land, when the sea is ebbed, shall be tried at common law, for it is then parcel of the country, and infra corpus comitatus; and so, between the high and low water mark, the common law and the admiralty have divisum imperium ... Until some strong reason can be assigned for a distinction, it would seem more conformable to law and nature to hold, that the bodies of counties, bounding on navigable waters, are limited at all times by the line of the sea tide; and this is the doctrine asserted by the admiralty."

*Id.* at 428.

A brief look at a few American cases shows that the alleged rule of *Sir Henry Constable's Case* does not exist here.

The principal case is *The Steamship Jefferson*, 215 U.S. 130, 30 S.Ct. 54, 54 L.Ed. 125 (1909). There, the Supreme Court held that admiralty jurisdiction applied to a ship in dry dock. To reach this result, the Court first found that a vessel moored to a wharf from which the tide had fully receded "would not cease to be a subject within the admiralty jurisdiction merely, because for a short period by operation of nature's laws, water did not flow about her." *Id.* at 142, 30 S.Ct. at 58. Because a vessel at a dry wharf was still subject to admiralty jurisdiction, a vessel in a dry dock was too.

*The Steamship Jefferson* was not a departure from prior American law. Indeed, in *Dailey v. City of New York*, 128 F. 796 (S.D.N.Y.1904), the district court held that the owner of a scow could sue in admiralty for damages to his vessel that occurred *after* the tide had receded. In that case, five scows had entered at high tide a semi-enclosed area in the East River. When the tide receded, four scows came to rest safely on the earth but one settled on a hump and was damaged. The owner of the damaged scow sued the city in admiralty. The court held that even though the tide had receded at the time of the damage, the area

was "navigable water" and admiralty jurisdiction existed.

The modern case of *United States v. Stoeco Homes, Inc.*, 498 F.2d 597 (3rd Cir. 1974), *cert. denied* 420 U.S. 927, 95 S.Ct. 1124, 43 L.Ed.2d 397 (1975), also sheds light on the meaning of the term "navigable water." In that case, the United States sued to enjoin a developer from developing an area that had been tidal marsh until 1927. One issue in the case was whether the Rivers and Harbors Appropriation Act of 1899 (which prohibited the discharge of any refuse matter into "navigable water" without permission of the Secretary of the Army, 33 U.S.C. § 407), covered tidelands. The court first found that Congress intended that the term "navigable water" in the Act have the same meaning it had in admiralty at the time the Act was passed. *Stoeco*, 498 F.2d at 609. The court then held that the admiralty definition of "navigable water" in tidal areas included all areas within the "ebb and flow of the tide" and was not limited to "areas of actual or reasonably potential navigability." *Id.* at 610.

■ No cases or statutes since the turn of the century appear to have restricted the scope of the term "navigable water." Admiralty jurisdiction in America therefore extends to all areas within the ebb and flow of the tide, regardless of whether those areas are actually covered by water at the time of the alleged event. And the best determination of "the land which is actually covered by the tides most of the time" is the mean high water mark. *Borax Consolidated, Ltd. v. City of Los Angeles*, 296 U.S. 10, 26, 56 S.Ct. 23, 31, 80 L.Ed. 9 (1935); *see also Leslie Salt Co. v. Froehlke*, 578 F.2d 742 (9th Cir.1978), where the Court observed, 578 F.2d at 750, that after *Borax*, "the test of the mean high water mark became the inveterate standard to be applied in limiting federal authority over navigable waters."

■ It follows that "navigable water" and thus the boundary of admiralty jurisdiction in tidal areas does not ebb and flow with the tide but extends to the mean high water mark at all times, because "[w]heth-

er, at the time the injury was sustained, [libellant] ... was landward or seaward of the actual edge of the water, his rights should be the same, and they should be determinable in the same court." *Hastings v. Mann*, 340 F.2d 910, 912 (4th Cir.1965), *cert. denied* 380 U.S. 963, 85 S.Ct. 1106, 14 L.Ed.2d 153.

This holding alone does not, however, completely settle the situs issue. Appellants further argue that even if the shoreward boundary of admiralty jurisdiction in tidal areas is the mean high water mark, admiralty jurisdiction should not exist in this case because the decedents were standing on "extensions of land" (the beach or the bottom of the lake) when the accident occurred.

■ The extension of land doctrine prevents recovery in admiralty for damages to "piers, docks, wharves and similar *structures* extending over navigable waters" and for "personal injuries suffered by persons while upon such *structures* ... unless ... caused by a vessel on navigable waters." *Hastings v. Mann, supra*, at 911 (emphasis added). The doctrine does not apply here because no structure was involved and because the harm was caused by a vessel on "navigable water."

Because the admiralty definition of "navigable water" in tidal areas includes the area up to the mean high water mark, and because the "extension of land" doctrine does not apply in this case, the district court correctly found that the situs requirement of *Executive Jet* was satisfied.

B. Nexus

■ To meet the nexus requirement of *Executive Jet*, the alleged wrong must bear a "significant relationship to traditional maritime activity." 409 U.S. at 268, 93 S.Ct. at 504. The alleged wrongs of Tideland in this case are essentially that it negligently placed an unreasonably low, uninsulated power line over the "navigable water" of Silver Lake, North Carolina, and that it placed no warning signs, signals, or buoys on or around the power line to alert sailors to the danger (A–27 to 30, A–237 to

242). The alleged wrongs of Coleman and Catamaran are mainly that they negligently designed, manufactured and sold a catamaran with an all metal, uninsulated mast, that they failed to put non-metal parts on the boat with which it could be handled, and that they failed to warn of the danger of electrocution if the mast of the boat touched a power line (A–33 to 37, A–242 to 245).

Four factors should be considered in determining whether the alleged wrongs satisfy the nexus test of *Executive Jet:*

(1) the functions and roles of the parties;

(2) the type of vehicles and instrumentalities involved;

(3) the causation and type of injury; and

(4) traditional concepts of the role of admiralty law.

*Oman v. Johns-Manville Corp.*, 764 F.2d 224, 230 (4th Cir.1985); *see also Kelly v. Smith*, 485 F.2d 520, 526 (5th Cir.1973), *cert. denied* 416 U.S. 969, 94 S.Ct. 1991, 40 L.Ed.2d (1974).

The district court properly considered these four factors in finding that the alleged wrongs of appellant Tideland met the nexus requirement. It stated:

The role of the decedents at the time of the accident was that of a sailor attempting to remove a vessel from navigation; defendant's role was that of owner and operator of a power line, which proved to be a dangerous impediment to this navigational function. The instrumentalities involved are clearly the mast of the vessel and the overhead electric power line; the contact between these instrumentalities resulted in decedents' deaths by electrocution. The act complained of with respect to defendant Tideland is the negligent placing of a dangerous impediment—a power line—to navigation. Assuming navigation (as the court finds exists herein), "[s]uch activity ... [is] considered as having a significant relationship to traditional maritime activity within the meaning of *Executive Jet*."

Admiralty law traditionally has concerned itself with the protection of sail-

ors from injury or death caused by obstructions to navigation—this concern is the basis of the court's decision herein (A–479).

The district court's finding is not "clearly erroneous" and therefore should be upheld. *See Eaton v. Dorchester Development, Inc.,* 692 F.2d 727, 732 (11th Cir.1982).

Tideland argues that the district court erred in finding that the power line was an obstruction to navigation. However, the district court's conclusion that, at the time and place of the accident, the power line was seaward of the mean high water mark is supported by substantial evidence (*see* Shafer Affidavit, A–136; Shafer Deposition, A–181 to 182; Burks Affidavit, A–119; Smith Affidavit and Photograph, A–139 and EA–3) and controverted by none. Because, among other things, the power line passed over "navigable water" and was a potential obstruction to navigation, admiralty jurisdiction existed.

As to appellants Catamaran and Coleman, the *four factor* nexus requirement is also satisfied:

First, Catamaran's and Coleman's roles at the time of the accident were those of manufacturer, marketer, supplier, and seller of catamarans. Hassinger Complaint ¶ 8 (A–23), Powell Complaint ¶ 6 (A–231).

Second, such vehicles are obviously maritime.

Third, the injury was caused by an allegedly defective mast which, to paraphrase *Oman, supra,* at 229, allowed electricity to spread through the vessel and electrocute three persons.

Fourth, one of the purposes of admiralty law is to protect sailors from defective equipment while they are engaged in maritime activity. *See, e.g., Richards v. Blake Builders Supply, Inc.,* 528 F.2d 745 (4th Cir.1975); *accord Oman v. Johns-Manville Corp., supra,* at 229; *Austin v. Unarco Industries, Inc.,* 705 F.2d 1, 10–11 (1st Cir.1983).

The wrongs of Coleman and Catamaran, as alleged, therefore satisfy the nexus test of *Executive Jet.*

### III.  Conclusion

The district court correctly held that admiralty jurisdiction extends at all times in tidal areas to the mean high water mark. Its unchallenged findings that the decedents, the mast and a substantial portion of the sailboat, and the power line were below the mean high water mark are fully supported by the evidence. The court's finding that the alleged wrongs of Tideland satisfied the nexus requirement of *Executive Jet* is not clearly erroneous. As to appellants Catamaran and Coleman, although the district court may not have used a formal analysis in finding that their alleged wrongs satisfied the nexus requirement of *Executive Jet,* nevertheless, a review of the four factors of *Oman* shows that in fact the nexus requirement is met also as to them.

The decision of the district court is therefore AFFIRMED.